THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| MARGARET STARKS, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No: 4:21-cv-00435-RLW |
| | ) | |
| ST. LOUIS COUNTY, ET. AL., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF HER MOTION FOR SUMMARY JUDGMENT
<u>AGAINST ST. LOUIS COUNTY</u>**

Plaintiff Margaret Starks hereby moves for summary judgment on the issue of liability against Defendant St. Louis County Based upon Count II (unlawful policies), Count III (Unlawful pattern, practice, or custom), and Count IV (Failure to Train, Supervise, and/or Discipline), all of which are cognizable pursuant to 42 U.S.C. §1983.

### INTRODUCTION

As soon as he was admitted to the St. Louis County Justice Center, and pursuant to a standing medical order at the jail, Drexel Starks was placed on a doctor ordered "Clonidine Protocol," which required jail nurses to give him physical assessments twice each day and the administration of medications three times each day. For almost 30 hours, however, Starks was not given any such assessments or medications. As a result, he became severely dehydrated. He suffered alone in his jail cell while wearing restraints on his ankles and wrists, to later die in custody for a parole violation.

The *undisputed* facts of record also show that St. Louis County ("County") knew that the corrections medical staff had a long history and ongoing practice of failing to give these critically necessary, doctor ordered assessments and medications to detainees. Further, The County also knew that its corrections medicine staff members were improperly trained, supervised, and disciplined, with respect to management of inmates suffering from acute opioid withdraw. Plaintiff contemporaneously files *Statements of Uncontroverted Material Facts* that detail this pattern and practice was well-known and long-ignored, with extreme indifference, by the County. The County knew, before Starks died that its indifference left people like Starks at high risk of suffering and dying.

**ARGUMENT**

This case is stems from the death of Mr. Drexel Starks, a pretrial detainee at St. Louis County jail. The misconduct of County employees who directly caused his death have been described in detail in the contemporaneously-filed *Motion of Plaintiff for Summary Judgment Against Defendants Tinoco, Tucker and Skaggs*. In an effort to avoid needless repetition and to be respectful of this Court's resources, Plaintiff hereby incorporates by reference the facts and legal arguments cited in that Motion for Summary Judgment.

The actions of the individual Defendants also need to be viewed in the wider context, however. All of the misconduct by individual Defendants employed by the County were guided and directed by County policies, procedures and customs. That is the basis for these *Monell* Claims. The County's practices and customs in this case were not intended to protect the pretrial detainees who were recovering from addiction. In fact, the undisputed facts show that the County embraced and implemented each of the following dysfunctional and unconstitutional policies, procedures, customs and practices:

- To <u>not</u> conduct required assessments of inmates who were in opiate withdrawal;

- To <u>not</u> provide prescribed medication to the inmates who desperately needed medication;

- To <u>not</u> properly train its nurses to comply with the standing order of the jail's doctor;

- To <u>not</u> enforce the standing order of the doctor through employee training and discipline;

- To <u>not</u> look for or audit failures of its employees to comply with the doctor's standing order;

- To <u>not</u> report failures of its employees to comply with the doctor's standing order; and

- To <u>not</u> address, fix, and discipline failures of its employees to comply with the doctor's standing order;

This is a list that should embarrass and humiliate any self-respecting government entity. In the case of the County, however, all of these problems were painfully evident for many years, yet the County did nothing to fix these problems, and in fact, with clear indifference, ignored these problems.

**Liability Based on Lack of Supervision and Training**

Plaintiff is well-aware that in most cases, it can be quite a challenge to hold a municipality liable under § 1983 for failure to supervise and train. These claims can not succeed without evidence the municipality "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." Parrish v. Ball, 594 F.3d 993, 1002 (8th Cir.2010). Claims for failure to supervise require the same analysis as a claim for failure to train. *Robinette v. Jones,* 476 F.3d 585, 591 (8th Cir.2007) (citing *Liebe v. Norton,* 157 F.3d 574, 579 (8th Cir.1998)).

Plaintiffs must show that these failures amount to "deliberate indifference to the rights of persons with whom [the plaintiff came] into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The court are required to apply an objective standard of

3

deliberate indifference to the claims, which "permit[s] liability to be premised on obviousness or constructive notice." *Farmer v. Brennan,* 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). See S.M., 874 F.3d at 585; *Walton v. Dawson,* 752 F.3d 1109, 1117 (8th Cir. 2014). "A pattern of similar constitutional violations ... is 'ordinarily necessary' to demonstrate deliberate indifference ...." *Connick v. Thompson,* 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). Alternatively, a plaintiff may show that, in light of the employees' duties, the need for more supervision or training was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [government entity] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390, 109 S.Ct. 1197. See also, *P.H. v School Dist. Of Kansas City,* 265 F.3d 653 at 660 ("Notice may be implied where the failure to train is so likely to result in a constitutional violation that the need for training is patently obvious ...."). The government entity's failure to supervise or train must be "the moving force [behind] the constitutional violation." *Canton*, 489 U.S. at 389, 109 S.Ct. 1197, quoting *Polk Cty. v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

**Establishing a Cause of Action Based on Municipal Custom or Practice:**

To determine whether a plaintiff the existence of a relevant municipal custom, he or she must satisfy three requirements:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir. 1999)(quoting *Jane Doe A By and Through Jane Doe B v. Special School Dist. of St. Louis County,* 901 F.2d 642, 645 (8th Cir. 1990). See also, *Mick v. Raines,* 883 F.3d 1075, 1079 (8th Cir. 2018)(citing Mettler). Inaction or laxness can constitute government custom if it is permanent and well settled. See *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. To be actionable, such a government custom of laxness or inaction must be the moving force behind the constitutional violation. *Tilson v. Forrest City Police Dept.,* 28 F.3d 802, 807 (8th Cir. 1994).

In cases where a plaintiff sues a government entity for policies or customs, it is critical to establish that the entity had notice of the problem. *Harris v. City of Pagedale,* 821 F.2d 499, 505 (1987)(where plaintiff successfully established a pattern of sexual misconduct by City police officers).

In the recent case of *Leonard v. St. Charles County Police Department*, 59 F.4th 355 (2023), an inmate argued that the police department was liable for having a county-wide policy or custom of failing to administer prescription medications. The Eighth Circuit court rejected the plaintiff's argument, explaining that there was no evidence of such a widespread practice. In that case, the plaintiff's only evidence was a "handful of unconnected incidents, ranging from failing to give ulcer medication to one inmate to refusing to accommodate the food allergies of another." *Id* at 364. The Court indicated that in order to succeed, the plaintiff would have needed to show a "widespread, persistent pattern" of withholding prescription medication." *Id.,* (citing to *Mick v. Raines,* 883 F.3d 1075, 1080 (8th Cir. 2018)(where the court held no *Monell* violation where there

5

was no "widespread custom or practice of unconstitutional misconduct known to and unaddressed by policymaking officials.") and *Jane Doe "A" ex rel Jane Doe "B" v. Special Sch. Dist. of St. Louis,* 901 F.2d 642, 644, 646 (8th Cir. 1990) (concluding that a handful of somewhat related complaints against a bus driver over two years was insufficient to show a custom of "unconstitutional practices").

**The Overwhelming Evidence of Unconstitutional Pattern and Practice : Plaintiff Statement of Fact No. 52: Widespread Denial of Healthcare to Inmates.**

Extraordinary claims require extraordinary evidence, but this is a case with extraordinary evidence that amply satisfies the *Monell* requirements. In this case, the undisputed facts demonstrate a widespread, persistent pattern of withholding prescription medication combined with a widespread persistent pattern of failing to conduct any of the twice-daily assessments prescribed by the standing order of the County's jail doctor. See, especially, Plaintiff's Statement of Facts #52.[1] This excruciatingly detailed analysis conducted by Plaintiff shows that **no assessments** and **no medication** were provided to a vast majority if any of other inmate/patients the same week and same days the assessments and medications were not provided to Mr. Starks on August 5 and 6, 2015. Shockingly, the jail ignored the needs of *all similarly situated patients in the unit*. All of these inmates were medically fragile and at high risk. None of them had any ability to shop around for better medical care. If the County didn't *establish and implement* policies, procedures, customs and practices to deliver the healthcare required by the standing order of the jail doctor, these inmates would inevitably suffer and/or die. Based on the evidence in this

---

[1] PSOF 52

case, many of those inmates did suffer and (pursuant to an admission by a County nursing supervisor discussed below) many died.[2]

Plaintiff's Statement of Facts No. 52 is both detailed and expansive, citing to dozens of pages of sworn testimony in this case, in addition to citing to twelve separate third party medical exhibits. At the County Jail, numerous other patients on the Clonidine Protocol were also denied their doctor-ordered assessments and medication during the same day and week as Mr. Starks. This evidence demonstrates that this pattern of ignoring desperate patients continued from at least as far back as March 2014 up to at least the day Starks died.[3]

**Other Evidence of Systemic Healthcare Dysfunction at the County Jail**

St. Louis County had a unwritten policy and custom of ignoring the Withdrawal observation duties of nurses, but also the written directions on the Withdrawal Checklist that clearly state if a patient is "symptomatic", a medical provider must be contacted.[4] St. Louis County Corrections Medicine had a pervasive pattern and culture of cover-up as demonstrated by a March 6, 2014, email in which CQI coordinator, Cathy Duffie, admitted that Bridgette Collins' auditing of medical records was going to "get us in trouble."[5] Providing patients at the County jail with their doctor-ordered mediations continues to be a problem in 2023.[6] St. Louis County Corrections Medicine policy, in effect in August 2015 required Corrections Medicine to conduct a Morbidity and Mortality Review ("MMR") when a detainee died to determine the appropriateness of clinical care and then send the final written report to the St. Louis County

---

[2] The contemporaneously-filed *Memorandum in Support of Motion for Summary Judgment* regarding three of the individual Defendants in this case describes more specifically what happened to Mr. Starks, medically speaking, as well provides insight into as County's shocking lack of concern and lack of response to the ongoing problems related to inmates withdrawing from opiate addiction. See p. 5 and pp. 10-14 of that memorandum for more detail.
[3] PSOF 52.
[4] PSOF 74
[5] PSOF 75.
[6] PSOF 76.

Department of Health, Director Research and Medical Services.[7] An MMR was not conducted to determine the appropriateness of clinical care for Mr. Starks.[8] Instead, for obvious reasons of clear liability, St. Louis County didn't investigate Stark's death.

**Admissions of Nursing Supervisor Rita Skaggs (formerly Rita Hendrix) Regarding Lack of Medical Accountability at the St. Louis County Jail**

Rita Skaggs served as the supervisor over all of the nurses at the jail. She admitted that many inmates who were under standing orders to be treated for addiction withdrawal at the jail were suffering and dying. She knew that many of them were being ignored by jail medical staff, yet neither she nor her employer took any meaningful steps to address this horrific situation. Skaggs admitted that during her 8-year employment at the jail, probably ***more than twenty detainees treated for withdrawal died***. She admitted that this was "very common" from 2008-2015. Skaggs is a named Defendant in this case. In her deposition she stated:

"Q: How many times do you think somebody died who was on acute withdraw syndrome…

A: Whoa, whoa, whoa..[…..] Oh, more than ten, yes.

Q More than 20?

A Probably, yes…[….] It was – it was very common.[9]

In her deposition, Skaggs also admitted the following:

1. She was responsible for the training, discipline, and supervision of the nurses under her authority, including Defendants Tinoco and Tucker.[10]

---

[7] PSOF 67
[8] PSOF 68
[9] PSOF 47
[10] PSOF 53-56.

8

2. She was the Corrections Medicine Nurse Manager for over eight years, beginning in January 2009 and also at the time of Mr. Starks death in August 2015.[11]

3. To learn whether nurses were failing to conduct doctor ordered assessments and/or failing to distribute medications, the supervisory nurses could audit the medication administration records ("MARS") and medical records for individual patients.[12]

4. She never inquired to determine which of her nurses were not conducting assessments of patients on the withdrawal protocol.[13]

5. She raised the problem of her nurses' inability to provide medication to their patients to her own supervisors at the Department of Health).[14]

6. She never recommended that a nurse be suspended or fired for failing to conduct the doctor ordered assessments of patients on an acute withdraw protocol. She doesn't recall disciplining a jail nurse for missing a Clonidine Protocol assessment.[15]

7. She never audited or checked to see if Defendant Tinoco and Tucker were conducting their withdrawal assessments in the weeks and months prior to Starks' death.[16]

8. Corrections Medicine failed to implement an adequate oversight system to unsure that detainees with known medical needs received the prescribed treatments.[17]

---

[11] PSOF 53
[12] PSOF 54
[13] PSOF 61
[14] PSOF 56
[15] PSOF 59
[16] PSOF 60
[17] PSOF 62

9

9. Neither Defendant Tucker nor Defendant Tinoco was disciplined by Defendant Hendrix (Skaggs) for their failure to conduct doctor-ordered assessments of Mr. Starks.[18]

10. Neither Defendant Tucker nor Defendant Tinoco was disciplined by Defendant Hendrix (Skaggs) for their failure to provide Mr. Starks with his doctor-ordered medications.[19]

11. No jail nurses would be disciplined - in any way - as a result of the failures to conduct assessments for Mr. Starks or provide Mr. Starks with his medication.[20]

12. Notice of Unconstitutional Pattern and Practice: The March 2014 PDCA.[21]

13. Providing Acute Withdrawal patients their doctor ordered assessments and mediations was a "persistent" problem at the jail recognized as early as the March 2014 PDCA.[22]

14. In March 2014, sixteen months prior to Starks' death, a Plan-Do-Care-Act ("PDCA"), a Corrections Medicine quality control document, was created to address the known problem of patients on the Clonidine Protocol not getting their assessments, their vital signs taken, and also not getting their medications.[23]

15. Screenshot from the March 2014 PDCA, published six months prior to the death of Mr. Starks[24]:

---

[18] PSOF 63
[19] PSOF 64
[20] PSOF 65
[21] PSOF 48 See also, Exhibit 10. "Plan/Do/Check/Act" document. See following page for image.
[22] PSOF 46;
[23] PSOF 49
[24] PSOF 48, See also, Exhibit 10.

10



16. PDCAs include identifying an issue, developing a plan to resolve that issue, implementing the plan, and measuring success.[25]

17. The purpose of drafting the March 2014 PDCA document identifying the problems was to correct the problems identified in the PDCA.[26]

18. The March 2014 PDCA on the Clonidine Protocol was never finalized and no "plan" "do" "check" or "act" was ever implemented to correct the problems noted.[27]

---

[25] PSOF 50
[26] PSOF 50
[27] PSOF 51

19. She doesn't know why the PDCA was never "finalized" other than a general, claimed lack of resources.[28]

**Staffing Issues**

The evidence set forth above demonstrates unrelenting, longstanding, widespread (affecting far more than Mr. Starks) systematic, institutional dysfunction that encompasses matters of life and death. There is no excuse for such conduct. But perhaps the County might argue that it should be excused because the jail had staffing shortages. That would be incorrect. Staffing shortages are no excuse for violating constitutional rights. "The Eighth Circuit has allowed claims to proceed when prison officials knew of a dangerous environment and failed to adequately staff that area of the prison." *Benton v. Payne*, No. 4:22-CV-00746-LPR, 2023 WL 4174719, at *1 (E.D. Ark. June 26, 2023), *citing to Krein v. Norris,* 309 F.3d 487 (8th Cir. 2002); *Lawrence v. Norris,* 307 F.3d 745 (8th Cir. 2002). In *Krein*, the Eighth Circuit Court of Appeals held that inadequate staffing can form the basis for a cause of action:

> [P]laintiff in the present case has specifically alleged that, "by failing to provide adequate security in an open barracks," defendants were deliberately indifferent to a risk of harm to plaintiff.

*Krein v. Norris,* 309 F.3d 487, 491 (8th Cir. 2002).

See also, *Harris v. Thigpen* 941 F.2d 1495 (11th Cir. 1991), holding that:

> Deliberate indifference to inmates' health needs may be shown, for example, by proving that there are "such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."

Therefore, lack of staffing cannot be employed as a legal defense. Courts not only disallow it from being used as a defense, but they also allow it to be the basis for a municipal liability claim.

---

[28] PSOF 57

**The Undisputed Evidence Demonstrates that the County is Liable Under *Monell***

The undisputed evidence set forth above supports each of the *Monell* principles articulated by each of the following key cases cited at the top of this brief:

- The County "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." *Parrish v. Ball,* 594 F.3d 993, 1002 (8th Cir.2010).

- The County's failures amount to "deliberate indifference to the rights of persons with whom [Hansen came] into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

- The County has exhibited "A pattern of similar constitutional violations" demonstrating "deliberate indifference" *Connick v. Thompson,* 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011).

- The evidence in this case makes it clear that the County has had months or years of Notice of these serious problems, but also, "Notice may be implied where the failure to train is so likely to result in a constitutional violation that the need for training is patently obvious ...."). *P.H. v School Dist. Of Kansas City,* 265 F.3d 653, 660 (2001).

- Inaction or laxness can constitute government custom if it is permanent and well settled. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 (1978)

- A government custom of laxness or inaction must be the moving force behind the constitutional violation. *Tilson v. Forrest City Police Dept.,* 28 F.3d 802, 807 (8th Cir. 1994).

- To establish *Monell* liability, a plaintiff needs to show a "widespread, persistent pattern" of withholding prescription medication." *Mick v. Raines,* 883 F.3d 1075, 1080 (8th Cir. 2018).

**Legal Standard**

"Summary judgment is appropriate when the record presents no genuine issue of material fact, and the movant is entitled to judgment as a matter of law." *Hodges v. Minnesota Dep't of Corr., 61 F.4th 588* (8th Cir. 2023) (citing Fed. R. Civ. P. 56). Fed. R Civ P. 56 authorizes summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

13

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1028 (8th Cir. 2000). Pursuant to Rule 56, any "party" can move for summary judgment. Therefore, Rule 56 motions are available to plaintiffs as well as defendants.

When responding to a motion for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (U.S. 1986). Indeed, "[t]he opponent must come forward with specific facts showing that there is a genuine issue for trial." *Herring v. Canada,* citing *Anderson.* To contest a fact, the non-moving party must offer more than speculation. *Lacey v. Norac, Inc.,* 932 F.3d 657, 660 (8th Cir. 2019); *Putman v. Unity Health Sys.,* 348 F.3d 732, 734 (8th Cir. 2003); *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 801 (8th Cir. 2011)(non-moving party must offer "more than mere speculation, conjecture, or fantasy"). Rather, the nonmovant has an affirmative burden to designate specific facts creating a triable controversy." *Rusness v. Becker County, Minnesota,* 31 F.4th 606, 614 (2022) (citing to *McConnell v. Anixter, Inc.,* 944 F.3d 985, 988 (8th Cir. 2019). To assert that there is a genuine issue of material fact, the nonmovant "must respond by submitting evidentiary materials that set out specific facts. . ." *Gannon Int'l, Ltd. v. Blocker,* 684 F.3d 785, 792 (8th Cir. 2012).

Wherefore, Plaintiff asks that this Court grant summary judgment in favor of Plaintiff and against St. Louis County, based on *Monell* liability.

Dated: November 10, 2023

_____

Mark J. Pedroli, MBE 50787
***PEDROLI LAW, LLC***
7777 Bonhomme Ave, Suite 2100
Clayton, Missouri 63105
314.669.1817
314-789.7400 Fax
Mark@PedroliLaw.com

*ATTORNEY FOR PLAINTIFF*

**Certificate of Service**

The above signed counsel certifies that, on the above listed date, a true and accurate copy of the foregoing was served electronically via email, in both word and .pdf format to all counsel or record.