# THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MARGARET STARKS,            )
                               )

          **Plaintiff,**        )
                               )

v.                             )       **Cause No:**    **4:21-cv-00435-RLW**
                               )

**ST. LOUIS COUNTY, ET. AL.,**    )
                               )

          **Defendants.**     )

## PLAINTIFF'S STATEMENTS OF UNCONTROVERTED MATERIAL FACTS

COMES NOW Plaintiff Margaret Starks, by and through counsel, hereby submits statements of uncontroverted material facts in support of her motions for summary judgment against Defendants St. Louis County (*Count II unlawful policy, Count III unlawful pattern, practice or custom, and Count IV failure to train, supervise and discipline*), Defendant Rita Hendrix ("Rita Skaggs") (*Count IV*),  and Defendants Reginald Tinoco and Debra Tucker (*Count I*) and states as follows:

### *Plaintiff's Claims*

1.      Plaintiff filed her Fourth Amended Complaint in this matter on June 21, 2023. This lawsuit arose out of the death of Plaintiff's son Drexel Starks ("Mr. Starks") while he was detained in the St. Louis County Justice Center on a parole violation. See Plaintiff's Fourth Amended Complaint, Doc #269 ¶1.

**Response:**

2.      Plaintiff's claims against Defendant St. Louis County are Count II for unlawful policy, Count III for unlawful pattern, practice, or custom, and Count IV for failure to train,

supervise, and/or discipline, all *Monell* liability claims. See Plaintiff's Fourth Amended Complaint, Doc #269 pgs. 21, 23, 25.

**Response:**

3.　　　Plaintiff's claims against Defendant Hendrix (Skaggs), Tinoco and Tucker are contained in Count I for the deprivation of medical care cognizable under 42 U.S.C. §1983. See Plaintiff's Fourth Amended Complaint, Doc#269 pg 19.

**Response:**

### *Acute Withdrawal syndrome and Mr. Starks' missed assessments*

4.　　　On August 4, 2015, during Mr. Starks' intake medical assessment at the Justice Center, nurse Connie Heitman assessed Mr. Starks as suffering from "Acute Withdrawal Syndrome". (Ex. 1, Starks' Medical Records pg 7-8 of 30.)

**Response:**

5.　　　As a result of the intake assessment, Starks was placed the "Clonidine Protocol" (Ex. 1, Starks' Medical Records pg 7-8 of 30.).

**Response:**

6.　　　The Clonidine Protocol was a jail doctor ordered treatment of patients suffering from Acute Withdrawal Syndrome that included a prescribed method of treatment. (Id., Starks' Medical Records pg 7-8 of 30.).

**Response:**

7.　　　As part of the Clonidine Protocol, jail nurses were ordered by the jail doctors to conduct a) *medical assessments* of Starks twice a day at 0900 and 2100 and to b) administer multiple medications including *Clonidine, Folic Acid, Multivitimin, Thiamine, Pink Bismuth, Acetaminophen, and Emetrol* to Mr. Starks three times per day at 0900, 1700, and 2100 hours. (Ex.

[1](Ex. 3, Depo. Trans of C. Duffie: 200:19-25, 201:1)(See also [Ex. 4](Dr. Heller Report, p.1))

**Response:**

     8.     The *medical assessments* of patients suffering from Acute Withdrawal Syndrome are to include the nurse's observation of the patient as recorded in a detailed Opioid Withdrawal Checklist ("Withdrawal Checklist"), including, inter alia, the checking of a patient's eyes, skin, and the patient's ability to walk. ([Ex. 1](Starks Medical Records)) ([Ex. 2](Withdraw Checklist[1])) ([Ex. 5](Depo. Trans of R. Skaggs 19:7-25, 20-1:20, 13:24-25, 14:2-6, 14:20-25, 15:1)).

**Response:**

     9.     St. Louis County Corrections Medicine ("Corrections Medicine") policies required that jail nurses *document* the vital signs and observations of the patient to ensure that the medical assessments are being completed. ([Ex. 3](Depo Trans of C. Duffie: 230:25, 231:1-3, 281:1-6)).

**Response:**

     10.     Acute Withdrawal Syndrome presents a risk to all patients suffering from it, and often serious risks. ([Ex. 4](Dr. Heller Report, 2-3)([Ex. 5](Depo Trans of Rita Skaggs, 19:7-15))

**Response:**

     11.     No nurse at the St. Louis County jail conducted Starks' doctor ordered medical assessments and no nurse gave any withdrawal medications to Starks on the evening of August 5, 2015, and the morning of August 6, 2015. ([Ex. 6](Corp. Rep. Depo. Transcript 263:4-22, 260:10-23) ([Ex. 5](Depo Trans of Rita Skaggs 265:16-25, 266:1-18, 268:21-23, 269:1-3, 269:11-15) "Q: [..] you said that there was two assessments that were ***missed***, right? A: ***Correct***.")([Ex. 7](Depo Trans Susman 138:10-21, *"so somebody missed the 9:00 p.m. assessment, [..] and.. the 9:00 a.m.,*

---

[1] Although the Withdrawal Checklist is found in Starks Medical Records, it is being marked as a separate exhibit for convenience of the Court

3

*correct? A:·· Correct.*")(<u>Ex. 8</u> , Depo Trans of S. Broadwater 105:24-107:9)(<u>Ex. 9</u>, Depo Trans of R. Tinoco 132:24-133:10, "***Q:*** *Okay.· But you agree that somebody missed -- somebody missed two assessments, right? [Objections]* ***A.*** *· · · I agree something happened.· I mean, something was missed, yes.* ***Q****: But you agree, specifically, that somebody missed two assessments? [Objections]* ***A.*** *· · · Quite possible, yes.*")

**<u>Response:</u>**

12.     Starks' medical records confirm that medical assessments were not conducted for Mr. Starks nor was *any* medication given to Mr. Starks on the evening of August 5, 2015, and the morning of August 6, 2015. (<u>Ex. 1</u>, Starks' Medical Record pg. 28-30).

**<u>Response:</u>**

13.     A nurse should have provided Starks with his assessments and medications on the evening of August 5, 2015, and August 6, 2015.  (<u>Ex. 5</u>, Depo Trans of Rita Skaggs *286:10-19* "*So, it's possible then that if someone were vomiting and had diarrhea and their blood pressure was progressively getting worse and they had an unsteady gait - which I think you saw Mr. Starks had at one point in his assessment - that it's important for those people in that condition to get an assessment from a qualified nurse, correct?* ***A: Yeah, they should have an assessment****.*")

**<u>Response:</u>**

14.     As a result of the two failed assessments, Starks did not get observed by medical staff pursuant to doctor's order nor did Starks get any medications for a period of nearly thirty hours. (<u>Ex. 4,</u> Report of Dr. Heller, p 3)

**<u>Response:</u>**

15.     This nearly thirty-hour gap in observation, treatment and failure to follow doctor's order by the jail's nurses caused Stark's deteriorating medical condition, dehydration and death. (Id., Report of Dr. Heller, p 3).

**Response:**

16.     Starks experienced excruciating pain throughout the time he was untreated by jail nurses. (Id., Report of Dr. Heller, p 3)

**Response:**

*17.*     Correction Medicine policy and/or written protocol required nurses conducting medical assessments and administering the various Clonidine Protocol medications to get the patients out of their cell if the patient did not show up at the medical cart, and if the patients were not on the floor, the nurse was mandated to find the patient. (Ex 2, Withdrawal Checklist), (Ex. 3, Depo Trans of C. Duffie: 226:1-7, 85:7-13, 86:1-11) (Ex. 10, *March 2014 PDCA* for Clonidine Protocol, see highlights, "***Patients do not consistently get medications. We need to determine why they are not getting their medications as ordered…*"" *Current process states that all patients are to be called out at 9am and 9pm for withdrawal medications so blood pressures can be taken. There should be documentation on all days where the patient is supposed to receive Clonidine at 9am and 9pm." "When the Medication Nurse passes medications, that nurse is responsible to make sure all patients who are on the Clonidine protocol come out of their cell for the 9am and the 9pm medication pass."" If the officer states the patient is not in the unit, the nurse writes that the patient did not show, and then is responsible to locate the patient in IJMS to determine if the patient was released or moved to a different unit. If the patient moved to a different unit, the nurse should go to that unit to give the medication, and then transfer the MAR to the new unit so the medication can be continued."*) (Ex. 24, March 6 and March 9, 2014, Cathy Duffie emails *"We*

*still have the issue that patients are <u>not being called out</u> for Clonidine.."*)( <u>Ex. 25</u>, April 23, 2014 Fay Crancer (Sweeney) email, "*all patients MUST be called out for ALL scheduled medications(especially Clonidine, Antibiotics, antipsychotics, etc.) If a patient is not in his/her cell, they should find the patient to administer the medication. It is not acceptable to just put numbers in the box.*"(emphasis original)

**<u>Response:</u>**

18.     When a patient on the Clonidine Protocol is symptomatic, nurses are required to contact a medical provider for guidance. (<u>Ex. 2</u>, Starks' Withdrawal Checklist) (<u>Ex. 9</u>, Depo Trans of R. Tinoco 44:23-25, 45:1-25, 46:1).

**<u>Response:</u>**

19.     Starks was symptomatic. (<u>Ex. 9</u>, Depo Trans of R. Tinoco 85:23-25, 86:1-6), (<u>Ex. 7</u>, Depo Trans of M. Susman 129:2-16) (<u>Ex. 4</u>. Dr. Heller Report, 2-3)

**<u>Response:</u>**

20.     Starks never signed a refusal of treatment form. (<u>Ex. 1</u>, Starks Medical Records (no refusal included), and also see <u>Ex. 5</u>, Depo Trans of Rita Skaggs, 52:12-25, 53:1-20).

**<u>Response:</u>**

21.     No jail staff signed a refusal of treatment form witnessing that Starks refused his assessments or mediation. (<u>Ex. 1</u>, Starks Medical Records (no refusal included), and also see <u>Ex. 5</u>, Depo Trans of Rita Skaggs, 52:12-25, 53:1-20).

**<u>Response:</u>**

22.     If a patient doesn't appear for their assessments and a signed refusal is not obtained, it's the nurses responsibility to tell a corrections officer to bring the patient out for their medical

assessment. (<u>Ex. 1</u>, Starks Medical Records) (<u>Ex. 2</u>, Withdrawal Checklist) (<u>Ex. 5</u>, Depo Trans of Rita Skaggs, 56:9-25, 57:1-12)

**<u>Response:</u>**

### *Delay to Infirmary and County Policy forbidding nurse from calling 911*

23.    Nurse Dalcour testified that she found Starks on the floor of his cell on August 6, 2016 at approximately 2:05 p.m. and she couldn't obtain a pulse, blood pressure or pulse oxygen levels for Starks. (<u>Ex. 1</u>, Starks' Medical Records, p___)

**<u>Response:</u>**

24.    There was a substantial and unexplained delay in getting Starks to the infirmary, Starks didn't arrive until 2:45 p.m. (<u>Ex.11</u>, Depo Trans of T. Dalcour 50:22- 52:17)(<u>Ex. 9</u>, Depo Trans of R. Tinoco 136:22-137:19)

**<u>Response:</u>**

25.    It was the policy of St. Louis County to forbid nurse Dalcour from calling 911 without Dalcour first seeking approval. (<u>Id</u>., 137:17-19)

**<u>Response:</u>**

### *Defendant Nurses Reginald Tinoco and Debra Tucker*

26.     Defendant Tinoco was the only nurse working the medicine cart in Mr. Starks'
housing unit the evening of August 5, 2015. (Ex. 12, Event Schedule, bate stamped 186440 and
highlighted) (Ex. 9, Depo Trans of R. Tinoco 65:20-25, 67:2-22).

**Response:**

27.     Defendant Tinoco further testified that Mr. Starks' medical records shows that
Tinoco did not conduct a nursing assessment for Mr. Starks on the evening of August 5, 2015. (Id.,
84:16-22). Tinoco also agreed that there was an assessment missing on the morning of August 6,
2015. (Id., 85:2-8).

**Response:**

28.     Mr. Tinoco does not recall ever calling a medical provider regarding *any patient* in
withdrawal, including Mr. Starks. (Id., 46:1-8).

**Response:**

29.      Defendant Tucker was the only nurse administering medications to patients in
Stark's housing unit on the morning of August 6, 2015. (Ex. 12, Event Schedule, bate stamped
186443 and highlighted)(Ex. 13 Depo. Trans of D. Tucker 14:22-25, 15:1-24, 16:20-25, 17:1-
9)(Ex. 3, Depo. Trans of C. Duffie 158:20-23, 156:21-25, 157:1-17, 158:20-23, 306:20-25).

**Response:**

30.     The St. Louis County jail's Event Schedule does not show any other nurses entering
Starks' housing unit, HU8A, besides Defendant Tinoco and Defendant Tucker on the evening of

August 5, 2015 and the morning of August 6, 2015, respectively.  (Ex. 12, Event Schedule, bate stamped 186440, 186443 and highlighted)

**Response:**

31.     Defendant Tucker testified that she does not remember ever interacting with Mr. Starks. (Ex. 13, Depo Trans of D. Tucker 19:11-16).

**Response:**

32.     Defendant Tucker also testified that she does not remember anyone questioning her about Mr. Starks' care after he died. (Id.,19:24-25, 20:1-23).

**Response:**

33.     Defendant Tinoco conceded that "something went wrong" in providing care to Mr. Starks. (Ex. 9, Depo Trans of R. Tinoco, 125:2-19).

**Response:**

34.     Defendant Tinoco was not admonished or disciplined for not conducting his nursing assessment and proving Starks his medication. (Ex. 9, Depo Trans of R. Tinoco 98:24-25, 99:1-2)

**Response:**

35.     Defendant Tinoco was never disciplined for failing to properly administer the Clonidine protocol. (Ex. 14, Tinoco Personnel File)( Ex. 9, Depo Trans of R. Tinoco 13-24).

**Response:**

36.     Defendant Tinoco did not recall Corrections Medicine implementing training or other interventions to improve execution of the Clonidine Protocol during his time working at the jail. (Ex. 9, Depo Trans of R. Tinoco 76:3-13).

**Response:**

37.     St. Louis County Corrections Medicine computer metadata reveals that Defendant Tinoco reviewed Mr. Starks' medical record multiple times, *after Starks' death*. (Id., 97:13-25, 98:1-25, 99:1-21)(Ex. 15, Starks Patient WorkLog/Metadata).

**Response:**

38.     Defendant Tinoco and Tucker knew about the significant risks to patients in not conducting assessments and distributing medications prior to Starks death. (Ex. 5, Depo Trans of Rita Skaggs 227:9-24).

**Response:**

39.     Defendant Tinoco and Tucker were told many times that they had to "fill out" and complete the assessments for patients on the Clonidine Protocol, (Ex. 5, Depo Trans of Rita Skaggs 227:9-24, 229:19-24, 231:3-8).

**Response:**

40.     Defendant Tucker resigned from Corrections Medicine approximately one week after Starks' death. (Ex. 16, Tucker email)

**Response:**

41.     The jail nurses were ultimately responsible for failed patient assessments. (Ex. 5, Depo Trans of Rita Skaggs 215:19-25, 216:1-18)

**Response:**

### *Drexel Starks' dehydration and death*

42.     Starks died on August 6, 2015, and the St. Louis County Medical Examiner reported "unexpected death in patient withdrawing from heroin and cocaine with dehydration and cardiac dysrhythmia." (Ex. 17, Starks Medical Examiner's Report pg. 2) (Ex. 5, Depo Trans of Rita Skaggs 302:12-"A: As far as I know *he died of dehydration* -- and – and withdraw from drug use.")

**Response:**

43.     On the day Starks died, he was complaining of being dehydrated and requested help or to go to the infirmary.  (Ex. 17, Medicolegal Examiner's Report, bate stamp 190803, highlighted. "*STARKS[sic] advised jail staff that he was not feeling well today and requested to go to the infirmary. He was reported to have been complaining of being dehydrated.*")

**Response:**

44.     Dehydration was a factor causing Starks' death. (Ex. 5, Depo Trans of Rita Skaggs 281:18-21, 285:17-24, 286:1-5, "*And I'm assuming that one of the primary causes of dehydration for people who are on acute withdraw syndrome is vomiting and diarrhea? A True. Q And how*

*many – what percentage do you think of people that are on acute – that are acutely withdrawing have vomiting and – and diarrhea? A 100 percent…Q: And that's a good reason to have a standing order to have them seen twice a day by a nurse, correct? A: Yes.*") (<u>Ex. 4</u>, Dr. Heller Report, p. 2-3)

**<u>Response:</u>**

45.     Had Starks been assessed and provided his medication on the evening of August 5, 2015, and the morning of August 6, 2015, dehydration would have been detected, medication would have been provided to prevent dehydration and death would have been prevented. (<u>Ex. 5</u>, Depo Trans of Rita Skaggs, 286:21-25, 287:4 *"Because the assessment can, indeed, prevent something worse from happening to that person if they're not seen? For example, further dehydration, further lowering of the blood pressure and even potentially dying? [objections] A: Yes"*) (<u>Ex. 4</u>, Dr. Heller Report, p. 2-3)

**<u>Response:</u>**

***Pattern and Practice, Municipal Liability and Nurse Supervisor Rita Hendrix/Skaggs***

46.     Providing Acute Withdrawal patients their doctor ordered assessments and mediations was a "persistent" problem at the jail recognized as early as the March 2014 PDCA. (<u>Ex. 5</u>, Depo Trans of Rita Skaggs, 265:2-15).

**<u>Response:</u>**

47.     St. Louis County was aware that patients withdrawing presented a risk of death as *more than twenty patients* at the jail had died withdrawing between 2008-2015. (<u>Ex. 5</u>, Depo Trans

of Rita Skaggs, 273:13-24 "**Q**: How many times do you think somebody died who was on acute withdraw syndrome... **A**: Whoa, whoa, whoa..[.....] Oh, more than ten, yes. **Q** More than 20? A Probably, yes...[....] It was – *it was very common*, and also see 274:8-9 and 19:10).

**Response:**

*Notice of Unconstitutional Pattern and Practice: The March 2014 PDCA*

48.     In March 2014, *sixteen months prior to Starks' death*, a Plan-Do-Care-Act ("*PDCA*"), a Corrections Medicine quality control document, was created to address the known problem of patients on the Clonidine Protocol not getting their assessments, their vital signs taken, and also not getting their medications. (Ex. 10, March 2014 *PDCA*) (Ex.19, 2014 Corrections Medicine emails related to Clonidine Protocol problems, see specifically March 4, 2014 email from Cathie Duffie to Ann Kearney *"if something happens to someone who is withdrawing in Intake, and an attorney reviews his chart, he is going to ask why we didn't follow the orders for the withdrawal protocol...I bet 75% of the Clonidine Protocol sheets are blank for several days after they get to the floor."*) (See also, Ex. 19 March 4, 2014 email from Cathy Duffie to Bridgette Collins "...We have noticed recently that we are having (either staff or process) issues with our Clonidine Protocol for patients who are experiencing withdrawal symptoms...it appears that patients are not getting medications, not getting blood pressures taken or charted...") (See also Ex. 20, Depo Trans of F. Crancer (Sweeney), 61:20-25, 62:1-8), (Ex. 5, Depo Trans of Rita Skaggs, 27:18-20, 28:1-25, 29:1-17, 31:20-25, 32:1.)

**Response:**

*49.*     After identifying the problem, *PDCA*s was intended to develop a plan to resolve the problems, to implement the plan to resolve the problems, and to measure results. (Ex. 10, March 2014 *PDCA*). (Ex. 5, Depo Trans of Rita Skaggs, 26:19-24)

**Response:**

50.     The purpose of drafting the March 2014 PDCA document identifying the problems was to correct the problems identified in the PDCA. (Ex. 5, Depo Trans of Rita Skaggs, 31:2-25, 32:3-6)

**Response:**

*51.*     The March 2014 PDCA on the Clonidine Protocol was never finalized or completed and no "plan" "do" "check" or "act" was ever implemented to correct the problems providing medical care to patients on the Clonidine Protocol. (Id., 44:3-8) (Ex. 18, Aug. 30, 2014 Cathy Duffie email, "*ALSO... this probably would have been changed **if we had completed the QCI project for compliance with the Clonidine protocol**.*"(emphasis added)

**Response:**


*Unconstitutional Pattern and Practice continues in 2015:*

***No assessments and medication were provided to <u>other patients</u> the same week and same day as Starks in August 2015***

52.     Other third-party patients on the Clonidine Protocol were also denied their doctor ordered assessments and medication during the same day and week as Mr. Starks evidencing that

this pattern continued from at least March 2014 through the day Starks died. (Ex. 3, Depo. Trans of C. Duffie: See generally p. 164- 233 (more specifically cited below)) (Also See generally Exhibits 29 through 38) More specifically, See:

- o Ex. 28, Patient "W.I." [On Clonidine Protocol; No assessment conducted on August 5 and 6, 2015 evenings, See also corresponding testimony Ex. 3, Depo. Trans of C. Duffie: 164:2-25, 165:1-15]],

- o Ex. 29, Patient "M.C." Medical records [On Clonidine Protocol; No assessments from August 5, 6, 7, 8. 9, 2015, See also Ex. 3, Depo. Trans of C. Duffie: 168-172.

- o Ex. 30, Patient "E.H." Medical records [Placed on Clonidine Protocol on August 2, 2015; No assessment in a.m. of August 3 and August 4, no assessments the entire day of August 5, 2015 and August 6, 2015, See also Withdrawal Checklist bate stamped 186809 and Ex. 3, Duffy Depo Trans 174:17-25, 175:1-25, 176:1-3 ],

- o Ex. 31, Patient "L.H," Medical records [Started Clonidine Protocol August 3, 2015, No Withdrawal Checklist in medical record, Defendant Tinoco visits patient on August 5, 2015 p.m. (bate stamped 186814), see also Ex. 3, Depo. Trans of C. Duffie, 179:12-25, 180:1-25, 181:1-25, 182:1-2 "Q: So this is a medical record without a checklist at all, correct? A: It is"],

- o Ex. 32, Patient "C.M." Medical records [Placed on Clonidine Protocol August 5, 2015, missed assessment p.m. of August 5, 2015 and August 6, 2015 a.m. and p.m., See also Ex. 3, Depo. Trans of C. Duffie: 182:19-25, 183:1-25, 184:1-15], Ex. 33, Patient "R.P." Medical records [Put on Clonidine Protocol August 3, 2015, No Withdrawal Checklist, No medical assessment p.m. of August 5, 2015, no

assessment entire day of August 6, 2015, See also Ex. 3, Depo. Trans of C. Duffie 187:1-25, 188:2-25, 189:1-15, 190:2-7],

- Ex. 34, Patient "J.T." Medical records [Put Clonidine Protocol August 2, 2015; no encounters with medical staff the entire day of August 3, 2015; No assessment p.m. of August 5, 2015 and a.m. August 6, 2015, See also Ex. 3, Depo. Trans of C. Duffie 191:19-23, 192:7-25, 193:7-25, 195:16-19 "A: There should be a checklist… there's not a checklist"

- Ex. 35, Patient "R.P." Medical Records [Put on Clonidine Protocol August 3, 2015; No encounters on August 4, 2015; only one assessment on August 5, 2015; See also Ex. 3 Depo. Trans of C. Duffie 187:1-25, 188:1-25, 189:1-15]

- Ex. 36, Patient "J.T." Medical Records [Put on Clonidine Protocol August 2, 2015; no medical assessment August 3, 2015, no checklist or assessment on August 5, 2015; See also Ex. 3 Depo. Trans of C. Duffie 191:19-23, 192:1-25, 193:1-25]

- Ex. 37, Patient "S.W." Medical records [Put on Clonidine Protocol August 3, 2015; No medical assessment August 3, 2015 a.m. and no assessment August 4, 2015 p.m., and no assessment all day August 5, 2015 and all day August 6, 2015; See also Ex. 3, Depo. Trans of C. Duffie 195:20-25, 196:3-5, 197:4-25, 198:9-25, 199:5-12.] (See also generally Ex. 3, Depo of C. Duffie, 231:20-21 referring to other patient's medical records "clearly, every single assessment was not done, and that's unfortunate" and 233:2-13 "Q: ..We kind of conducted…an audit here and what you're saying [seeing] is missed assessments and missing checklists? A: Yes Q: And that's obviously a concern? A: Yes").

- o Ex. 38, Patient "A.Z." Medical Records [Started on Clonidine Protocol August 5, 2015; no assessment the evening of August 5, 2015; no assessment the morning of August 6, 2015; See also Ex. 3 Depo. Trans of C. Duffie 201:10-25, 202:1-25, 203:1-18]

**Response:**

*Nurse Manager Rita Hendrix (Skaggs)*

53.     Defendant Hendrix (Skaggs) was the Corrections Medicine Nurse Manager for over eight years, beginning in January 2009 and also at the time of Mr. Starks death in August 2015. (Ex. 5, Depo Trans of Rita Skaggs 9:25, 10:1-7, 261:21-22).

**Response:**

54.     To learn their nurses were failing to conduct the doctor ordered assessments and/or failing to distribute medications, the supervisory nurses could audit the medication administration records ("MARS") and medical records for individual patients. (Id., 215:19-25, 216:1-18)

**Response:**

55.     Nurse Manager Hendrix (Skaggs) did not know who was responsible for addressing the problems identified in the March 2014 Clonidine Protocol PDCA and ensuring these problems didn't result in the death of a patient. (Id., 217:6-16).

**Response:**

56.     Nurse Manager Hendrix (Skaggs) raised the problem of her nurses inability to provide medication to their patients to her own supervisors at the Department of Health. (Id., 219:2 through 222:15).

**Response:**

57.     Nurse Manager Hendrix (Skaggs) doesn't know why the PDCA was never "finalized" other than a general, claimed lack of resources. (Id., 223:20-23, 224:1-15).

**Response:**

58.     Nurse Manager Hendrix (Skaggs) claimed it was not her responsibility to finalize the PDCA and implement an action plan and, Ms. Skaggs didn't know who's responsibility it was to do this.  (Id., 224:21-23, 225:1-24, 226:1-3, 267:14-22).

**Response:**

59.     Nurse Manager Hendrix (Skaggs) never recommended that a nurse be suspended or fired for failing to conduct the doctor ordered assessments of patients on an acute withdraw protocol. (Id., 233:6-15). (See also, Ex. 3, Depo. Trans of C. Duffie 258:16-25, Duffie, the nurse manager subsequent to Defendant Hendrix (Skaggs), also doesn't recall disciplining a single jail nurse for missing a Clonidine Protocol assessment.

**Response:**

60.     Nurse Manager Hendrix (Skaggs) never audited or checked to see if Defendant Tinoco and Tucker were conducting their withdrawal assessments in the weeks and months prior to Starks' death. (Ex. 5, Depo Trans of Rita Skaggs 237:6-24, 238:1-5).

**Response:**

61.     Nurse Manager Skaggs never inquired to determine which of her nurses were not conducting assessments of patients on the withdrawal protocol. (Id., 239:5-24, 240:3-5, 242:5-11).

**Response:**

62.     Corrections Medicine failed to implement an adequate oversight system to unsure that detainees with known medical needs received the prescribed treatments. (Ex. 4, Dr. Heller Report, p. 3)

**Response:**

63.     Neither Defendant Tucker nor Defendant Tinoco was disciplined by Defendant Hendrix (Skaggs) for their failure to conduct doctor-ordered assessments of Mr. Starks. (Ex. 13, Depo Trans of D. Tucker 38:1-12) (Ex. 9, Depo Trans of R. Tinoco 98:24-25, 99:1-2).

**Response:**

64.     Neither Defendant Tucker nor Defendant Tinoco was disciplined by Defendant Hendrix (Skaggs) for their failure to provide Mr. Starks with his doctor-ordered medications. (Ex. 13, Depo Trans of D. Tucker 38:1-12) (Ex. 9, Depo Trans of R. Tinoco 98:24-25, 99:1-2).

**Response:**

65.     No jail nurses would be disciplined - in any way - as a result of the failures to conduct assessments for *Mr. Starks* or provide *Mr. Starks* with his medication. (Ex. 13, Depo Trans of D. Tucker 38:1-12) (Ex. 9, Depo Trans of R. Tinoco 98:24-25, 99:1-2)

**Response:**

### *St. Louis County Government obstruction after Stark's death*

66.     On August 31, 2015, within twenty-five days of Mr. Starks' death, a law firm representing the family of Starks, at that time, sent a sunshine request, litigation hold and preservation letter to St. Louis County related to, inter alia, Mr. Stark's medical treatment and the investigations into Mr. Stark's death and medical treatment. (Ex. 21, August 31, 2015, Litigation Hold and Preservation Letter)

**Response:**

67.     St. Louis County Corrections Medicine policy, in effect in August 2015 requires Corrections Medicine to conduct a Morbidity and Mortality Review ("MMR") when an inmate died to determine the appropriateness of clinical care and then send the final written report to the St. Louis County Department of Health, Director Research and Medical Services (Ex. 22, CM-11 Policy eff. Aug. 2014)

**Response:**

68.     An MMR was not conducted to determine the appropriateness of clinical care for Mr. Starks. (Depo Trans of C. Duffie 50:5-13)

**Response:**

69.     An MMR related to Mr. Starks was conducted but the final report was not preserved. (Ex. 28-B, Duffie email to Medical examiner)

**Response:**

70.     Because no MMR was conducted or preserved, St. Louis County violated CM-11 and did not create a written record demonstrating which nurses failed to conduct the medical assessments of Starks and which nurses failed to distribute medication to Starks and deprived this information from Starks' family. (Ex. 22, CM-11 Policy eff. Aug. 2014) (Depo Trans of C. Duffie 53:20-25, 54:1-8)

**Response:**

71.     St. Louis County did not create or retain any record demonstrating the identity of the nurses that did not perform the assessments and failed to provide medication to Mr. Starks and, as a result Plaintiff was unable to identify the individual nurses until Cathy Duffie identified the nurses she believed failed to conduct the assessments on Mr. Starks. (Ex. 23, February 7, 2023 Duffie Affidavit)

**Response:**

72.     A medical communication among the medical staff about a patient, known as a "patient message", was sent about Mr. Starks on August 5, 2015, a day before he died, and this message was also printed, but neither the electronic communication or the printed message about

Mr. Starks was preserved. (Ex. 15, Starks Patient Worklog (Metadata), bate stamped 188083, see red box).

**Response:**

73. Prior to identifying Tinoco and Tucker as the nurses likely to have failed to conduct the assessments and provide medication to Starks, Ms. Duffie had misidentified Teresa Pierce as the responsible nurse. Ex. 3, Depo. Trans of C. Duffie, 19:23-25, 20:1-16)

**Response:**

74. St. Louis County also had a unwritten policy and custom of ignoring the written directions on the Withdrawal Checklist that clearly states if a patient is "symptomatic", a medical provider must be contacted.(Ex. 2, Withdrawal Checklist, see highlight at bottom) (Ex. 3, Depo Trans of Rita Skaggs 15:21-25, 16:1-2,)(Ex. 7, Depo Trans of M. Susman 129:2-16).

**Response:**

75. St. Louis County Corrections Medicine had a pervasive pattern and culture of cover-up as demonstrated by a March 6, 2014, email in which CQI coordinator, Cathy Duffie, states than Bridgette Collins' auditing of medical records was going to "get us in trouble". (Ex. 27, March 6, 2014 Cathy Duffie email, "*I will be happy to have all of us take a stab at fixing it if we want to do that and forget the QCI [sic] process, but we don't have any projects yet….**and Bridgette is doing one that I think is going to get us in trouble**. She had a report run that checks how many people have blood pressures documented in the Vital Sign section of the EHR. She sent me the file.*

*Out of about 300 people, only 50 people had vital signs documented*.".." I would prefer to push her to work on something that matters…. :)"

**Response:**

76.     Providing patients at the jail with their doctor-ordered mediations continues to be a serious problem in 2023. (Ex. 20, Depo Trans of F. Crancer (Sweeney) 115:4-12).

**Response:**

77.     Pretrial detainees like Starks have a constitutional right to receive their jail doctor ordered assessments and medications. (Ex. 20, Depo Trans of F. Crancer (Sweeney) 130:22-25, 131:7-19, 132:19-23, 134:3-12)

**Response:**

Dated November 10, 2023

Respectfully submitted,

Mark J. Pedroli, MBE 50787
***PEDROLI LAW, LLC***
7777 Bonhomme Ave, Suite 2100
Clayton, Missouri 63105
314.669.1817
314-789.7400 Fax
Mark@PedroliLaw.com

-

*ATTORNEY FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 10th day of November 2023, a copy of the foregoing was served electronically via this Court's CM/ECF Filing System to all counsel of record.

*/s/ Mark Pedroli*