UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARGARET STARKS,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )          No. 4:21-CV-435 RLW
                                          )
ST. LOUIS COUNTY, et al,                  )
                                          )
            Defendants.                   )

## MEMORANDUM AND ORDER

This matter is before the Court on the following dispositive motions: Plaintiff Margaret Starks's Motion for Summary Judgment against Defendant St. Louis County and Motion for Summary Judgment against Defendants Rita Hendrix, Reginald Tinoco, and Debra Tucker (ECF Nos. 321 and 322); Defendants St. Louis County and Cedric Ivy's Motion for Summary Judgment (ECF No. 330); Defendants Faye Crancer and Rita Hendrix's Joint Motion to Dismiss (ECF No. 285); and Defendants Reginald Tinoco and Debra Tucker's Joint Motion to Dismiss (ECF No. 287).  Defendants St. Louis County and Cedric Ivy also move to exclude or limit the testimony of Plaintiff's expert, Ross Heller, M.D. (ECF No. 333). All the motions are fully briefed and ripe for review.[1]

_____

[1]Also before the Court is Defendants Reggie Tinoco, Debra Tucker, and Rita Hendrix's Motion for Leave to File a Sur-Reply in Response to Plaintiff's Motion for Summary Judgment. Plaintiff did not oppose the Motion, and the time to do so has expired.  Although these Defendants seek leave to file a surreply, a memorandum filed following a reply is properly designated a surresponse. The Court has reviewed the proposed filing, which addresses arguments related to the statute of limitations and tolling, and finds that it does not require the benefit of additional briefing to decide Plaintiff's Motion for Summary Judgment.  The motion is therefore denied.

On March 4, 2024, Plaintiff filed a "Motion for Sanctions and/or to Strike Defendant [sic] St. Louis County and Ivy's Untimely Summary Judgment and <u>Daubert</u> Motion."  (ECF No. 382). Plaintiff's counsel filed the motion to strike or, alternatively, for sanctions more than three months

For the reasons that follow, the Court grants Defendants St. Louis County and Cedric Ivy's Motion for Summary Judgment and denies Margaret Starks's Motions for Summary Judgment. Judgment will be entered in favor of Defendants St. Louis County, Cedric Ivy, Rita Hendrix, Reginald Tinoco, and Debra Tucker.  Defendants Faye Crancer and Rita Hendrix's Joint Motion to Dismiss and Defendants Reginald Tinoco and Debra Tucker's Joint Motion to Dismiss are denied as moot.  Defendants St. Louis County and Cedric Ivy's Motion to Exclude or Limit the Testimony of Plaintiff's Expert is also denied as moot.

## I. Background

This case arises from the death of Drexel Starks, who was detained at the St. Louis County Justice Center (the "Jail").  Mr. Starks was taken from the Jail in critical condition in an ambulance and died shortly thereafter at the hospital.  Plaintiff Margaret Starks, Mr. Starks's mother, alleges the Defendants in this case failed to provide her son with adequate medical care, including failing to provide him with medical care or attention, despite the fact he was obviously in medical distress.

The events at issue in this case took place between August 4-6, 2015.  Plaintiff initially filed suit five years later on August 6, 2020, in Missouri State Court against St. Louis County (the "County"), the County Department of Public Health, the County Department of Justice Services, Faisal Khan, the former Director of Public Health; Herb Bernsen, Director of Justice Services; Delores Gunn, a physician for the County; Fred Rottnek, a physician for the County; Nurse Melissa Doe, Nurse E. Criss, Commander Trachsel, Unknown Guards, and Unknown Nurses and/or

---

after the two Defendants filed their Motion for Summary Judgment and <u>Daubert</u> motion.  The two motions were not filed on November 10, 2023, which was observed Veterans Day, but on the following business day, November 13, 2023.  Plaintiff did not object that the two motions were untimely at the time they were filed and instead responded to the motions on the merits. The Court finds Plaintiff has waived any timeliness argument, and her motion is denied.

Medical Providers. In her initial petition, Plaintiff brought claims under the Eighth and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983, in addition to a state law claim of per se negligence.

Defendant Khan was served with the state court petition on March 29, 2021, and on April 15, 2021, he removed the case to this Court pursuant to 28 U.S.C. § 1441(a) based on federal question jurisdiction under 28 U.S.C. § 1331. At the time, only the County and its two subdivisions had been served, and they consented to removal.

Following removal, Plaintiff amended her pleading, and there was an additional delay due to lack of service.  The Court declines to go into the full history of this litigation, as it has been addressed in numerous orders, but there were a number of additional delays due to discovery disputes, amendments of pleadings, and attempts at alternative dispute resolution.

On June 21, 2023, the Court granted Plaintiff leave to file a Fourth Amended Complaint. In addition to Defendants St. Louis County, Delores Gunn, Connie Heitman, a nurse; Cedric Ivy, a correctional officer; Faisal Khan, Melissa Susman, a nurse; and William Trachsel, who were all previously named as defendants, the Fourth Amended Complaint brought claims against four new defendants: Reginald Tinoco, a nurse; Debra Tucker, a nurse; Rita Hendrix, a nurse manager; and Faye Crancer, "Medication Room Lead Nurse."  (ECF No. 269 at 9-11).  Shortly after she filed the Fourth Amended Complaint, Plaintiff voluntarily dismissed Defendants Khan, Gunn, Susman, Heitman, Pierce, and Trachsel.

Consequently, the following claims remain in this case: Deprivation of Medical Care in violation of the Eighth and Fourteenth Amendments against Defendants Tinoco, Tucker, and Ivy (Count I); Unlawful Policy – Monell Liability against the County (Count II); Unlawful Pattern, Practice, and/or Custom – Monell Liability against the County (Count III); and Failure to Train,

Supervise, and/or Discipline against the County, Defendant Crancer, and Defendant Hendrix (Count IV). All four claims are brought pursuant to 42 U.S.C. § 1983.

On August 4, 2023, after Plaintiff obtained service on the new Defendants and shortly before the case was referred to mediation a second time, Defendants Crancer and Hendrix filed a joint Motion to Dismiss Plaintiff's Fourth Amended Complaint, which is pending. The two defendants argue the claims against them in Plaintiff's Fourth Amendment Complaint are time barred, and that they are entitled to qualified immunity. Defendants Tinoco and Tucker also filed a joint Motion to Dismiss Plaintiff's Fourth Amended Complaint, which is also currently pending. Defendants Tinoco and Turner also argue the claims against them in Plaintiff's Fourth Amendment Complaint are time barred, and that they are entitled to qualified immunity.

The second attempt at mediation was unsuccessful, and on the deadline to file dispositive motions, Plaintiff filed a Motion for Summary Judgment as to liability against Defendant St. Louis County and a Motion for Summary Judgment as to liability against Defendants Tinoco, Tucker, and Hendrix.[2] The County and Defendant Ivy also filed a Motion for Summary Judgment, in addition to a Motion to Exclude Plaintiff's Expert, Ross Heller, M.D.[3] The County and Defendant Ivy argue they are entitled to judgment on the merits as a matter of law.

---

[2]Plaintiff states in her motion that Defendant Rita Hendrix is now known as Rita Skaggs. As no party has moved to amend or change this Defendant's name, for purposes of clarity, the Court refers to this defendant by the name on the pleadings, Defendant Rita Hendrix.

[3]On December 12, 2023, a month after the dispositive motion deadline had passed, Defendants Faye Crancer, Rita Hendrix, Reginald Tinoco, and Debra Tucker filed a Motion for Summary Judgment. The Court ordered the Motion stricken from the record for filing error because it was filed out time and without leave of Court. On December 13, 2023, the four defendants filed a Motion for Leave to File a Motion for Summary Judgment Out of Time, which Plaintiff opposes. The Defendants did not attach a proposed motion and supporting memorandum to their Motion for Leave, and the Court denies the motion for leave.

Having carefully reviewed the pending motions, the Court in its discretion will first take up the parties' cross-motions for summary judgment,

## II.  Summary Judgment Standard

The standard applicable to summary judgment motions is well settled.  Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Ia. v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor).  Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1030 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson,

477 U.S. at 248). A party resisting summary judgment has the burden to designate the specific

facts that create a triable question of fact, see Crossley v. Georgia-Pac. Corp., 355 F.3d 1112, 1114

(8th Cir. 2004), and "must substantiate allegations with sufficient probative evidence that would

permit a finding in the plaintiff's favor." Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir.

2005).

### III.    *Undisputed Facts*

After reviewing the record, and with the summary judgment standard in mind, the Court

accepts the following facts as true for purposes of resolving the parties' cross-motions for summary

judgment:

On August 2, 2015, Drexel Starks, who was 51 years old at the time, was arrested by the

Vinita Park Police Department for possession of a controlled substance in violation of his parole

and was booked into the custody of the St. Ann Jail on the same day. Mr. Starks was transferred

from the St. Ann Jail to the St. Louis County Jail on August 4, 2015.

Mr. Starks arrived at the Jail at approximately 12:00 p.m. and was examined by Nurse

Connie Heitman prior to booking.[4]  Nurse Heitman documented that Mr. Starks reported being

"dope sick," and having used one gram of heroin a day, including snorting a gram the day before.

Mr. Starks complained of stomach pain and rated his pain 10 out of 10.  Nurse Heitman noted Mr.

Starks appeared to be well-hydrated, was experiencing the "withdrawal symptom rhinitis," which

is a runny nose, and observed him leaning on the counter.

Drug use is very prevalent in the population served by the Jail, and it is common for

individuals entering the Jail to be experiencing withdrawal symptoms.  Physicians from the County

---

[4]Plaintiff named Connie Heitman as a defendant in her Fourth Amended Complaint but
voluntarily dismissed her from this case on June 22, 2023.  (ECF No. 271).

Department of Public Health developed "Standing Orders for Acute Withdrawal Syndrome Treatment – Clonidine, Heroine & Alcohol," which the Court will refer to as the "Withdrawal Protocol"[5] Under the Withdrawal Protocol that was in effect in 2015, nurses were to monitor the inmates' vitals and symptoms. In addition to the assessments, Clonidine, over-the-counter medications, and supplements were offered to assist inmates in dealing with symptoms of withdrawal. Clonidine's purpose in the withdrawal process was as a comfort medication to reduce symptoms such as sweating, agitation, nausea, and insomnia.

In August 2015, the Withdrawal Protocol was as follows:

(1)     Monitor patient vital signs and physical symptoms
(2)     Assess allergy status prior to administration of medication.
(3)     Do not start Clonidine until patient leaves ISC (intake) to go to a housing unit or the Infirmary. Monitor B/P BEFORE each dose of Clonidine. HOLD Clonidine if systolic blood pressure is less than 90 mm Hg OR if pulse less than 60 bpm.
(4)     May administer Pink Bismuth, Emetrol or lmmoduim [sic] AD, or generic equivalent, for symptomatic relief as per standing order
(5)     If patient symptomatic, e.g. tremors, dehydration, lightheadedness, schedule patient to be seen by Medical Provider. If the nurse is concerned that the patient is hemodynamically unstable, call the medical provider.
(6)     Contact Medical Provider for any questions regarding this protocol or a particular patient.
(7)     Administer medications as below:
         • Day 1 Clonidine 0.1 mg BID po
         • Days 2-6 Clonidine 0.2 mg BID po
         • Day 7 Clonidine 0.1 mg BID po
         • Day 8 Clonidine 0.1 mg Daily po
         • Day 9 Clonidine discontinued
         • Folic Acid 400mcg po x one (1) dose only
         • Multivitamin 1 tab daily x 30 days
         • Thiamine 100mg po x one (1) dose only

(ECF No. 332, Ex. 2 at 17). Nurses monitored inmates through twice daily assessments, and observations from these assessments were to be written on Observations Withdrawal Checklists,

[5]At the Jail, the Department of Justice Services ("DJS") is responsible for safety and security, while the Department of Public Health, which manages Corrections Medicine, is responsible for providing inmates medical care and treatment.

which were later scanned into the system.  Vital signs were to be entered into the inmate's medical records.

Based on Mr. Starks's verbal representations and her observations, Nurse Heitman placed Mr. Starks on the Withdrawal Protocol.  (ECF No. 332, Ex. 2 at 17).  In the medical records, Nurse Heitman listed Mr. Starks's medicines as: (1) Clonidine, one tablet daily for three days; (2) Folic Acid, one tablet daily (3) Multiple Vitamin, one tablet daily; (4) Thiamine, one tablet daily for three days; (5) Pink Bismuth, three times daily as needed for diarrhea and nausea; (6) Acetaminophen, three times daily as needed for headache and body aches; (7) Emetrol, three times daily as needed for nausea; (3) Imodium A-D, three times daily as needed; and (8) Maalox, three times daily as needed for heartburn.  (ECF No. 332, Ex. 2 at 17).  Nurse Heitman found Mr. Starks to be fit for non-infirmary confinement, and he was admitted to Housing Unit 8A, the pre-classification unit.

Nurse Sarah Broadwater assessed Mr. Starks in the evening of August 4, 2015, at approximately 9:30 p.m.  Nurse Broadwater took Mr. Starks's blood pressure, which was 90/60.  She noted he had an unsteady gait and dry mouth.  She did not administer Clonidine.  At approximately 8:44 a.m. on August 5, 2015, Medical Assistant Marquita Fletcher took Mr. Starks's blood pressure, which was 90/50.  Ms. Fletcher noted in the medical records, "Nurse Melissa aware of blood pressure."  (ECF No. 332, Ex. 2 at 14).  She did not administer Clonidine.  Around 9:00 a.m. on August 5, 2015, Mr. Starks was assessed by Nurse Melissa Susman.[6]  Nurse Susman noted that Mr. Starks's gait was now steady, and his mouth was moist.   (ECF No. 332, Ex. 2 at 37).

---

[6]Plaintiff named Melissa Sussman as a defendant in her Fourth Amended Complaint but voluntarily dismissed her from the case on June 22, 2023.  (ECF No. 271).

There is no evidence in the record that medical assessments were conducted on the evening of August 5, 2015, or the morning of August 6, 2015.

In the Jail's Event Schedule, which is a log maintained by DJS, Nurse Reggie Tinoco was recorded as being in Housing Unit 8A on August 5, 2015 at 7:48 p.m. (ECF No. 344, Ex. 12 at 16). Nurse Tinoco testified he has no recollection of the events of that day or ever having interacted with Mr. Starks. Nurse Debra Tucker was recorded in the Event Schedule as being in Housing Unit 8A on the morning of August 6, 2015 at 10:03 a.m. Nurse Tucker testified she did not recall being on the housing floor that day or ever having interacted with Mr. Starks.

Around 2:00 p.m. on August 6, 2015, Nurse Tonia Dalcour received a call from a correctional officer in Housing Unit 8A that there was a "patient suffering from withdrawals." (ECF No. 332, Ex. 2 at 12). From the record before the Court, it is not clear who made the call. Nurse Dalcour responded to the call, although there is a dispute of fact as to when she arrived at Mr. Starks's cell. Plaintiff points to evidence from Nurse Dalcour's testimony that she arrived at 2:05 p.m., while Defendants point to the Event Schedule to show she arrived at 2:11 p.m. When she did arrive, she observed Mr. Starks lying on the floor of his cell with a small pool of saliva by his face. Nurse Dalcour asked him what was wrong, and he mumbled, "I'm okay." (ECF No. 332, Ex. 2 at 12). According to the medical records, Mr. Starks did not respond to a correctional officer's request to get off of the floor, and the officer assisted in bringing him to his bunk. Mr. Starks was responsive to questions. He provided his date of birth, stated that he had not had anything to eat that day, and that he was withdrawing from heroin. When he was asked when was the last time he had eaten, Mr. Starks shook his head. Nurse Dalcour was unable to obtain a pulse or blood pressure reading. Nurse Dalcour testified that she did know if she was unable to get readings due to her error or equipment error. Nurse Dalcour contacted the nurse practitioner and

received a verbal order to "transfer to the infirmary for nursing assessment and IV fluids, if necessary." (ECF No. 332, Ex. 2 at 12).

Other correctional officers were contacted to assist in transporting Mr. Starks. Officer Tracy Page obtained a wheelchair and when she arrived at his cell, Mr. Starks was sitting on his bunk. "[D]ue to his unresponsiveness," three individuals, Officers Page and Chavis and Lieutenant Mitchell, assisted Mr. Starks with getting into the wheelchair. (ECF No. 332, Ex, 10).

At approximately 2:45 p.m., Mr. Starks arrived in the infirmary seated in the wheelchair with his eyes open. When Nurse David Dooley attempted to speak with him, Mr. Starks "appeared to attempt to respond, … but his response was unintelligible." (ECF No. 332, Ex. 2 at 12). Mr. Starks's pulse was weak and thready, and his blood pressure had to be taken manually and was low. Nurse Olly attempted to get Mr. Starks's pulse on his wrist, while Nurse Reynolds rubbed his sternum. Nurse Dooley's noted the following in the medical record:

> Corrections staff was informed of this RN's intention to obtain orders to send the [patient] out via 911. [Nurse Practitioner] E. Criss contacted via phone and approval received to send the patient out for evaluation via 911. Watch Commander Trachsel present in the Infirmary and immediately relayed a request for 911 to be contacted.

(ECF No. 332, Ex. 2 at 13). These events occurred sometime between 2:45 and 2:55 p.m. (ECF No. 332, Ex. 2 at 13). At 2:59 p.m., while waiting for EMS to arrive, Mr. Starks was noted to be in distress. He was lowered to the floor by corrections staff. Mr. Starks's pulse could not be obtained, and it appeared he was not breathing. Medical staff started CPR and rescue breathing. At 3:00 p.m., Code 1 was called. A nursing code team arrived on the floor and an IV was started. An Automatic External Defibrillator was attached to Mr. Starks and shockable rhythm was obtained. CPR was resumed. At 3:02 p.m., EMS arrived on the scene and took over treatment. Mr. Starks was given Narcan and EPI, and CPR was resumed. At 3:12 p.m., Mr. Starks's pupils were noted to be fixed and dilated. EMS continued treatment. At 3:20 p.m., a pulse was detected,

and Mr. Starks was transferred out of the Jail's infirmary to St. Mary's hospital by ambulance. Mr. Starks was pronounced dead at St. Mary's hospital at 3:51 p.m. on August 6, 2015.

Following an autopsy and investigation, the Medical Examiner for St. Louis County determined Mr. Starks's death to be "unexpected death in patient withdrawing from heroin and cocaine with dehydration and cardiac dysrhythmia."[7] (ECF No. 332, Ex. 2 at 28).  In addition, it was noted that Mr. Starks had bronchial asthma with acute congestion.

The narrative portion of the Examiner's Report, which was completed by Medicolegal Investigator Kelly Lovelace, states that Mr. Starks complained of dehydration and requested to go to the infirmary, but the report does not state when Mr. Starks complained or to whom.  The report provides the following:

> I called the Clayton Police Department and spoke with officer Robertson DSN-292 who was able to provide me the following information.
>
> STARKS was arrested and booked at the jail on Tuesday, August 4, 2015, on drug charges.  It was noted that he could have possible withdrawal symptoms while at the jail. STARKS was not on suicide watch. Officer Robertson did not know any additional past medical history.
>
> STARKS advised jail staff that he was not feeling well today and requested to go to the infirmary. He was reported to have been complaining of being dehydrated. STARKS was to go to the infirmary to be given fluids, but he went unresponsive upon arrival to the infirmary. STARKS was reported to have gotten to the infirmary at 2:45 p.m., and the Clayton Police Department was dispatched to the incident at 2:48 p.m. Upon police arrival, STARKS was coding, EMS found a pulse, and rushed him to the ambulance to go to the hospital.

(ECF No. 332, Ex. 2 at 22).

Defendant Cedric Ivy, a correctional officer, was working in Housing Unit 8A on August 6, 2015.  Defendant Ivy is not a medical provider, although he has received basic first aid and CPR

---

[7]According to the post-mortem toxicology report, cocaine was found in Mr. Starks's system.  There is no evidence that Mr. Starks ever reported to medical staff or corrections staff at the Jail that he had been using cocaine.

training.  Defendant Ivy testified that he does not independently recall any interaction or encounter with Mr. Starks.  There is an entry in the Event Schedule that Officer Ivy completed a "Key Tour" of the Housing Unity 8A at 2:03 p.m., and it was noted "all appears secure."[8]  (ECF No. 344, Ex. 12 at 20).

The County produced an IJMS Inmate file for Mr. Starks, which is maintained by DJS.  In the Journal History there is an entry dated August 4, 2015 at 1:30 p.m., which was made by a correctional officer other than Defendant Ivy.  The entry states "on med lock due to throwing up." (ECF No. 332, Ex. 1 at 7).  Another entry, dated August 6, 2015, at 2:08 p.m., states: "Inmate refused to cooperate with medical.  Refused legal visit – told Ofc. Ivy he was not getting up. Inmate was given tray at lunch, and he refused to eat." (ECF No. 332, Ex. 1 at 7).  This entry was made under ID #js0273, which is Defendant Ivy's DJS number.  However, Defendant Ivy attests that he did not enter this information.  He asserts that while the entry has his DJS number, he does not refer to himself in the third person when entering information into the computer system. Entering information under another employee's DJS number violates policy, but Defendant Ivy testified it is common practice in the Jail.

## IV.  Discussion

Plaintiff brings all of her claims pursuant to 42 U.S.C. § 1983.  Section 1983 "does not confer substantive rights" but rather it the mechanism "to vindicate rights conferred by the Constitution or laws of the United States."  Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000). To state a claim under § 1983, Plaintiff must set forth two essential elements: (1) the violation of

---

[8] Based on the Event Schedule, it appears Defendant Ivy performed five Key Tours of the Housing Unit during his shift on August 6, 2015.  Other officers completed tours that day as well, and it would seem that tours of the Housing Unit were done approximately every half an hour. (ECF No. 344, Ex. 12).

a right secured by the Constitution or laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).

Liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights.  Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990).  With regard to individual defendant, liability for damages under § 1983 is personal, and "each defendant's conduct must be independently assessed.  Section 1983 does not sanction tort by association." Smith v. City of Minneapolis, 754 F.3d 541, 547–48 (8th Cir. 2014) (citing Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805–06 (8th Cir. 2010) (citation and internal quotation marks omitted)); see also S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015).

Plaintiff alleges the Defendants failed to provide her son with medical care in violation of the Eighth and Fourteenth Amendments.  Claims of pretrial detainees should be evaluated under Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment.  Hartsfield v. Colburn, 371 F.3d 454, 456–57 (8th Cir. 2004) (citing Ervin v. Busby, 992 F.2d 147, 150 (8th Cir. 1993)). But pretrial detainees are "entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment." Id. (citing Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 906 (8th Cir. 1999)). Courts are to apply the deliberate indifference standard to a pretrial detainee's claims of inadequate medical care. Id. See also Davis v. Hall, 992 F.2d 151, 152–53 (8th Cir. 1993) (per curiam).

Deliberate indifference to the serious medical needs of inmates constitutes an "unnecessary and wanton infliction of pain" that is prohibited by the Constitution.  Estelle v. Gamble, 429 U.S. 97, 103 (1976).  It is a violation of the Eighth Amendment to intentionally deny medical care for

serious medical needs. Id. at 103.  Delaying access to medical care or intentionally interfering with

prescribed treatment can also constitute deliberate indifference.  Id. at 104–05.

To prevail on an Eighth Amendment claim, a plaintiff must establish two elements: "First,

the deprivation alleged must be, objectively, 'sufficiently serious.'"  Farmer v. Brennan, 511 U.S.

825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the plaintiff must

prove that the defendant acted subjectively with deliberate indifference to his serious medical

needs.  Id.; see Estelle, 429 U.S. at 106.  A prison official exhibits deliberate indifference when

the official actually "knows of and disregards" a prisoner's serious medical needs.  Farmer, 511

U.S. at 837; Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995).  "[T]he official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference."  Farmer, 511 U.S. at 837.  Constructive knowledge is insufficient.

Saylor v. Nebraska, 812 F.3d 637, 644 (8th Cir. 2016), as amended (Mar. 4, 2016). Plaintiff must

"show that [defendant] had been exposed to information concerning the risk and thus must have

known about it." Id. Alternatively, Plaintiff must show the risk was so obvious that knowledge can

be inferred. Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015).

Medical malpractice or a breach in the standard of care does not amount to a constitutional

violation.  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) "For a claim of deliberate

indifference, the prisoner must show more than negligence, more even than gross negligence, and

mere disagreement with treatment decisions does not rise to the level of a constitutional violation.

… Deliberate indifference is akin to criminal recklessness, which demands more than negligent

misconduct."  Popoalii v. Corr. Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008) (internal citations

and quotations omitted).  "Deliberate indifference may be found where 'medical care [is] so

14

inappropriate as to evidence intentional maltreatment.'" <u>Fourte v. Faulkner Cnty., Ark.</u>, 746 F.3d 384, 387 (8th Cir. 2014) (quoting <u>Smith v. Jenkins</u>, 919 F.2d 90, 92 (8th Cir. 1990)).

### A.  Serious Medical Need

Plaintiff contends the Defendants in this case ignored her son's serious medical needs.  In order to establish Mr. Starks had a serious medical need, Plaintiff must set forth evidence to show he was "diagnosed by a physician as requiring treatment" or that his medical need was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." <u>Barton v. Taber</u>, 820 F.3d 958, 964 (8th Cir. 2016) (citing <u>Jackson v. Buckman</u>, 756 F.3d 1060, 1065 (8th Cir. 2014)). Plaintiff asserts there is no doubt that Mr. Starks had a serious medical need, because a physician at the Jail specifically diagnosed his opiate withdrawal as requiring specific treatment pursuant to the Withdrawal Protocol.

Plaintiff mischaracterizes the evidence.  During his intake, Nurse Heitman assessed Mr. Starks as exhibiting signs of Acute Withdrawal Syndrome based on his verbal report of drug use and stomach pain.  She also noted that he leaned on the counter and had rhinitis, a runny nose. Based on this information, she placed Mr. Starks on the Withdrawal Protocol.  Mr. Starks was never seen by or diagnosed by a physician as having Acute Withdrawal Syndrome.  The Court declines to find Mr. Starks had a serious medical need based on this assessment alone. <u>See</u> <u>Grayson v. Ross</u>, 454 F.3d 802, 809 (8th Cir. 2006) (finding plaintiff had not established his son had an objectively serious medical need where he had not been diagnosed by a physician); <u>see</u> <u>also</u> <u>Ivey v. Audrain Cnty., Mo.</u>, 968 F.3d 845, 847 (8th Cir. 2020) (examining whether decedent had obvious signs of medical distress, even though shortly before his arrest he had been assessed at the hospital as having asthma and drug intoxication).

Elsewhere in her filings, Plaintiff asserts that Acute Withdraw Syndrome carries serious risks and implies that the fact Mr. Starks was assessed with the condition is, of itself, sufficient proof he was suffering from a serious medical condition.  The Court, however, finds Plaintiff fails to support this argument with either evidence or legal authority.

First, despite being at the center of this dispute, there is very little evidence in the record as to what Acute Withdrawal Syndrome is and the risks it presents.  The Court has gleaned from various parts of the record that an individual going through withdrawal may suffer from headaches, nausea, vomiting, diarrhea, and body aches, but it is not clear if every individual will suffer from all these symptoms.  Based on the record it appears there is no treatment or cure for Acute Withdrawal Syndrome, but rather individuals are given "comfort" medications to alleviate symptoms.  In the Court's view, many important questions remain unanswered about Acute Withdrawal Syndrome, such as whether there are degrees or stages of Acute Withdrawal Syndrome, how long the symptoms last, whether the symptoms differ based on the substance abused and/or or the length of drug use, and whether factors such as age and comorbidities affect the seriousness of Acute Withdrawal Syndrome.

Notably, Plaintiff did not offer expert testimony to establish that Acute Withdrawal Syndrome is a serious medical condition.  She disclosed Ross Heller, M.D., as a medical expert who prepared two expert reports.[9]  In neither of his reports did Dr. Heller describe what Acute Withdrawal Syndrome is or opine that it is a serious medical condition.  In one of his reports, Dr. Heller makes the statement, "In the time leading up to his death, Mr. Starks would have likely been suffering from pain, disorientation, confusion, nausea, and distress at a minimum, and also

---

[9]Defendants St. Louis County and Cedric Ivy filed a Motion to Exclude the Testimony of Ross Heller, M.D.  The Court need not determine whether Dr. Heller's opinion is admissible because Defendants are entitled to summary judgment even with Dr. Heller's reports.

vomiting and possibly diarrhea that led to his dehydration." (ECF No. 344, Ex. 4 at 3).  The basis for this statement is unclear, however. There is no indication if the statement is based on Dr. Heller's general knowledge about Acute Withdrawal Syndrome, or if is it based on specific information or evidence that relates specifically to Mr. Starks.  During his deposition, Dr. Heller was directly asked whether Acute Withdrawal Syndrome is a serious medical condition, and he replied as follows:

> A:      Like a death?  Like in death?  Is that what you mean by serious?  I don't know what you mean by serious.
>
> Q:      I don't know, I'm just asking if you think it's serious.
>
> A:      Well, it's not very comfortable. The -- the -- I can't ever remember seeing a patient die from it.

(ECF No. 334, Ex. 2 at 52).

In addition to there being a lack of evidence about the condition, Plaintiff has pointed to no controlling case law that holds withdrawing from drugs or alcohol is, of itself, a serious medical condition.  It is well documented in the media that there is a drug epidemic in this country, and there is evidence in this case that many individuals entering the Jail are withdrawing from alcohol and drugs – in fact, there is evidence that thousands of detainees enter the Jail in withdrawal.  As other courts have noted, withdrawal from drug and/or alcohol addiction is frequently seen and managed in prisons and jails, and it is not always a serious medical condition.  See Speers v. Cnty. of Berrien, 196 F. App'x 390, 396–97 (6th Cir. 2006) (prison official's knowledge that inmate was going through alcohol withdrawal, a "reality of life in a prison setting," does not establish a triable issue of fact over deliberate indifference); Rigney v. Marcum, No. CIV. 06-187-REW, 2007 WL 2979931, at *12 (E.D. Ky. Oct. 11, 2007) (noting withdrawal from drugs is often seen in jails, and report that inmate was in withdrawal did not amount to knowledge that inmate was suffering from

17

a serious medical condition); <u>see also</u> <u>Ivey</u>, 968 F.3d at 847 (examining whether there were other indications the detainee had a serious medical condition, apart from an assessment that he had asthma and was going through drug withdrawal).

Based on the record before it, the Court declines to find that every individual withdrawing from drugs is suffering from a serious medical condition.  The fact that Mr. Starks was assessed by a nurse as having Acute Withdrawal Syndrome at intake does not establish that he was suffering from a serious medical condition.  That said, symptoms from Acute Withdraw Syndrome, such as vomiting and diarrhea, can create a serious medical condition, and it is clear from the record that sometime after 2:00 p.m. on August 6, 2015, Mr. Starks's medical condition was critical, and he needed urgent medical care.  But deliberate indifference claims are not to be evaluated in hindsight, <u>Jones v. Minnesota Department of Corrections</u>, 512 F.3d 478, 483 (8th Cir. 2008), and liability is not established because the condition resulted in death.  <u>Grayson</u>, 454 F.3d at 807.  To establish liability for deliberate indifference in this case, the Court must examine, for each of the individual defendants, whether and when it became apparent to them that Mr. Starks had a serious medical need, and what each of the individual defendants did in response.

     **B.**    **Individual Defendants**

         *1.*    <u>*Cedric Ivy*</u>

Defendant Ivy, a correctional officer, moves for summary judgment arguing there is no evidence that he personally exhibited deliberate indifference toward Mr. Starks's constitutional rights.  In other words, he argues there is no evidence that he knew or should have known of Mr. Starks's need for immediate medical treatment, or that he delayed or denied

Mr. Starks care.[10]  Defendant Ivy testified that he has no independent recollection of Mr. Starks or the events of August 5 and 6, 2015, and asserts there is no evidence in the record that he knew of or should have known of Mr. Starks's serious medical needs.

In opposing his motion, Plaintiff points to the fact that Defendant Ivy was a correctional officer working in Housing Unit 8A where Mr. Starks was confined.  She asserts that under the Withdrawal Protocol, Defendant Ivy was required during his shift to escort Mr. Starks to the nurse at the medical cart for his assessments and medication, which he did not do.

Plaintiff further points to the fact after Mr. Starks was found on the floor of his cell, Defendant Ivy, or a person on his behalf, wrote the following in Mr. Starks's IJMS Journal: "Refused to cooperate with medical. Refused legal visit. Told Ofc. Ivy he was not getting up. Inmate was given a tray at lunch and he refused to eat."  (ECF No. 332, Ex. 1 at 5).  Plaintiff contends that not only was this entry was written at 2:08 p.m. on August 6, shortly after Mr. Starks was found in medical distress, but it directly contradicts evidence from the Medical Examiner's Medicolegal investigation report, which noted that Mr. Starks complained of dehydration and requested to go to the infirmary.  Plaintiff also points out that had Mr. Starks refused medical treatment, Defendant Ivy was required by policy to obtain a medical Refusal Form, which he did not do.  Plaintiff contends this notation in the IJMS Journal is evidence that "St. Louis County and Ivy conspired to blame Starks for his death and cover-up the underlying evidence supporting the Medicolegal investigator's conclusions that Starks had complained of dehydration and requested to do to the infirmary."  (ECF No. 360 at 2).

---

[10]Defendant Ivy argues, in the alternative, that he is entitled to qualified immunity.  The Court need not address whether Defendant Ivy is entitled to qualified immunity, because the Court finds there is no evidence Defendant Ivy violated Mr. Starks's constitutional rights, and he is entitled to summary judgment on this basis.

Setting aside that an entity cannot conspire with its employee, the evidence on which Plaintiff relies does not show or tend to show that Defendant Ivy knew or should have known Mr. Starks had a serious medical condition, or that he intentionally denied or delayed medical care treatment.

As to whether Defendant Ivy knew Mr. Starks had a serious medical condition, it is not clear from the record whether Defendant Ivy even knew Mr. Starks had been assessed with Acute Withdrawal Syndrome. Further, as discussed above, this fact alone would not establish Defendant Ivy knew Mr. Starks had a serious medical need.  It is undisputed that correctional officers do not have access to the inmates' medical records, and there is nothing to indicate Defendant Ivy had access to Mr. Starks's medical records.[11]  In Mr. Starks's IJMS file, a document Defendant Ivy did have access to, it was noted "subject may withdraw from heroin," and there is another notation dated August 4, 2015, at 1:30 p.m., made by another member of the corrections staff, that Mr. Starks was "on med lock due to throwing up." (ECF No. 332, Ex. 1 at 1 and 4).  Even if Defendant Ivy saw these notations, and there is no evidence he did, the fact that Mr. Starks was noted as being in withdrawal and throwing up on August 4, 2015, does not establish that Defendant Ivy knew Mr. Starks had a serious medical need during his shift on August 6, 2015.

It is undisputed that Defendant Ivy did tours of the housing unit during his shift on August 6 and, therefore, should have seen Mr. Starks when doing his rounds. There is neither testimony nor other documentation, however, that would indicate Mr. Starks's condition when Defendant Ivy was doing his tours or whether in fact he saw Mr. Starks.

---

[11]As discussed below, even if Defendant Ivy had access to Mr. Starks's medical records, the information contained therein does not establish that Mr. Starks was suffering from a serious medical condition before approximately 2:00 p.m. on August 6.

Plaintiff attaches great significance to a notation in the Medical Examiner's Medicolegal investigation report, which states that Mr. Starks complained of dehydration and requested to go to the infirmary.  Based on this notation, Plaintiff argues Defendant Ivy knew Mr. Starks needed medical treatment but prevented him from getting it.  Setting aside the issue of hearsay and whether the statement would be admissible at trial – the notation in the report is based on a statement from a police officer who received the information from an unknown source in the Jail – the notation in the report does not establish that Defendant Ivy knew Mr. Starks was suffering from a serious medical condition and needed medical attention.  The Medical Examiner's Medicolegal report does not indicate when Mr. Starks complained of dehydration, to whom he complained, or what his condition was at the time he made the complaint.  In fact, the statement in the report can be read to indicate Mr. Starks complained of dehydration when he was found on the floor of his cell. Simply put, even if the statement in the report is admissible, a finder of fact could not reasonably conclude from it that Mr. Starks complained to Defendant Ivy, such that Defendant Ivy knew Mr. Starks had a serious medical condition before approximately 2:00 p.m. on August 6.

Plaintiff also attaches great significance to the entry in IMJS Journal.  Plaintiff argues that based on the time the entry was made, the document is evidence that Defendant Ivy was attempting to cover up the fact that he prevented Mr. Starks from receiving required medical care.  Setting aside that the parties contend there is an issue of fact as who made the entry – a dispute the Court does not find material – the meaning of the entry is ambiguous, at best.[12]  The entry states that Mr.

---

[12]As stated above, Defendant Ivy avers in his declaration that he does not recall making this entry, and it is likely another officer made the entry using Ivy's employee ID, because the entry refers to Defendant Ivy in the third person.  Plaintiff points to the fact that it is against Jail policy to make an entry under another employee's ID, and contends the entry is evidence that Defendant Ivy "hurriedly recorded into the jail record, minutes after Starks was found, that it was Starks's fault for not cooperating, not [Defendant] Ivy's fault for not escorting Starks to medical." (ECF No. 360 at 2).  Alternatively, Plaintiff implies that Defendant Ivy was making the entry in

Starks refused to cooperate with medical and told Defendant Ivy that he was not getting up, but it is not clear from the entry whether it refers to when Mr. Starks was found on the floor of his cell around 2:00 p.m., and he would not get up, or to a time earlier in the day.  In short, there is nothing in the record to indicate what time this interaction occurred, what medical care Mr. Starks supposedly refused, or his condition at the time.  The entry is not evidence from which the jury could reasonably conclude Defendant Ivy knew Mr. Starks had a serious medical condition before approximately 2:00 p.m. on August 6 when he was found on the floor of his cell.

As for the second prong, Plaintiff also has not pointed to specific facts that would permit a finder of fact to conclude Defendant Ivy deliberately delayed or prevented Mr. Starks from receiving medical treatment.  Plaintiff argues there is evidence that Defendant Ivy prevented Mr. Starks from receiving medical care, because he did not bring him out of his cell to the medical cart for his assessment, which was required under Jail policy.  This argument is unpersuasive.  First, Defendant Ivy was working in Housing Unit 8A on August 6, but based on the Entry Logs, he was not the only correctional officer working in the unit.  Second, it is well established that a defendant's failure to follow a facility's policy is not enough to demonstrate a constitutional violation.  Cole v. Bone, 993 F.2d 1328, 1334 (8th Cir. 1993) ("[T]he issue is whether the government official violated the Constitution or federal law, not whether he violated the policies of a state agency.").  Third, as stated above, correctional officers do not have access to an inmate's medical records.  Under the policy, medical staff are to inform correctional officers when an inmate has not come to the medical cart for an assessment or to receive medication.  There is no evidence

---

the system when he should have been getting Mr. Starks medical treatment.  But Defendant Ivy is not a medical provider and undisputed facts show Mr. Starks was receiving treatment from a nurse at approximately the same time the entry was made.  Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) (citing Estelle, 429 U.S. at 104–05) (jail personnel should defer to medical staff).

in the summary judgment record that Defendant Ivy was asked to bring Mr. Starks out of his cell for his medical assessment between 9:00 a.m. on August 5 and 2:00 p.m. on August 6, and that he failed or refused to do so.

To establish a claim for deliberate indifference to a serious medical need, Plaintiff must have evidence showing that Defendant Ivy knew Mr. Starks had a serious medical condition, and prevented or delayed him from receiving medical treatment.  Construing the evidence in a light most favorable to Plaintiff, she has not established that Defendant Ivy disregarded a serious medical condition. Based on the record before it, there is no factual basis to support Plaintiff's claim that Defendant Ivy was deliberately indifferent to Mr. Starks's serious medical needs.  The Court finds Defendant Ivy is entitled to judgment as a matter of law.

2.     *Debra Tucker and Reginald Tinoco*

Plaintiff also alleges that Defendants Tucker and Tinoco were deliberately indifferent to her son's serious medical needs.  There is no evidence in the record that either of these nurses treated Mr. Starks.  Their names do not appear in Mr. Starks's medical records, and neither of these Defendants remember interacting with Mr. Starks.  Plaintiff contends Defendant Tinoco failed to provide an assessment and medicine under the Withdrawal Protocol on the evening of August 5, and Defendant Tucker failed to provide an assessment and medicine to Mr. Starks under the Withdrawal Protocol on the morning of August 6.

 Plaintiff reaches the conclusion that these two defendants were responsible for the missed assessments based on the Events Schedule, which is a log maintained by DJS.  The Events Schedule lists events such as when rounds or counts are made, when medical staff enter the unit, when inmates are transferred in or out of the unit or into a cell, or when the unit is in lockdown. Plaintiff points to the fact that Defendant Tinoco is listed as being in Housing Unit 8A on the

evening of August 5, and Defendant Turner was listed as being in the unit the morning of August 6. Plaintiff essentially argues that Defendants Tinoco and Tucker must be found liable for Mr. Starks's death because they were in the housing unit, and there is no evidence that they conducted assessments as required by the Withdrawal Protocol or gave Mr. Starks any medication.

But as discussed above, to establish a claim for deliberate indifference to serious medical need, Plaintiff must show the two Defendants knew or should have known Mr. Starks had a serious medical condition and failed to provide him medical treatment. Plaintiff cannot establish that Defendants Tinoco and Tucker violated Mr. Starks's constitutional rights because they failed to follow jail policies. Cole, 993 F.2d at 1334.

Unlike Defendant Ivy, Defendants Tucker and Tinoco would have had access to Mr. Starks's medical records, although there is no evidence in the summary judgment record that they accessed these records before Mr. Starks's death. Even if they had, the medical records show Mr. Starks had been assessed for Acute Withdrawal Syndrome, but there is nothing in them that would indicate he was suffering from severe symptoms of Acute Withdrawal Syndrome, such as that he was vomiting or had diarrhea.[13] On August 4 Mr. Starks's gait was described as unsteady, and he had low blood pressure the morning of August 5, but at 9:00 a.m. on August 5, it was noted that Mr. Starks's speech was clear, he had a steady gait, his eyes were steady, he had no tremors, and his mouth was not dry. (ECF No. 332, Ex. 2 at 37). In short, there is no evidence in the record as to Mr. Starks's condition at 7:48 p.m. on August 5, when Defendant Tinoco was in the unit, or at 10:03 a.m. on August 6, when Defendant Tucker was in the unit. Therefore, there is no evidence from which a finder of fact could reasonably conclude Defendants Tucker and Tinoco knew or

---

[13]There is a notation in Mr. Starks's LJMS profile that he vomited on August 4 before 1:30 p.m., but there is no evidence that he continued to vomit on August 5 and 6, or that Defendants Tucker and Tinoco had access to this DJS record or that knew that he had vomited.

should have known Mr. Starks was suffering from a serious medical condition, and that the two defendants consciously disregarded the risk and withheld medical care.

Plaintiff cites to a number of Eighth Circuit cases in support of her argument that Defendants Tucker and Tinoco are liable for failing to provide Mr. Starks medical care.  See Presson v. Reed, 65 F.4th 357 (8th Cir. 2023); Dadd v. Anoka Cnty., 827 F.3d 749 (8th Cir. 2016); Phillips v. Jasper Cnty. Jail, 437 F.3d 791 (8th Cir. 2006); and Foulks v. Cole Cnty., Mo., 991 F.2d 454 (8th Cir. 1993).  These cases are distinguished from the case at bar.

Presson affirmed the denial of summary judgment in favor of a sheriff and his deputy for failure to properly administer doctor-prescribed medications.  65 F.4th 357.  The Eighth Circuit held the defendants were not entitled to judgment as a matter of law, because there was evidence in the record they were given the plaintiff's doctor-prescribed medications at intake; the plaintiff specifically told the defendants he needed medication for a back injury; and the plaintiff begged multiple times a day for his medication but was told by a defendant that he would never get them. 65 F.4th 359.  The plaintiff also testified that the defendants gave him his prescription sleep aid multiple times a day and not at bedtime.  Id.  In contrast to the present case, the medications in Presson were prescribed by a doctor and were not directed to be given as needed.  But more importantly, there are specific factual findings in Presson that the defendants had actual knowledge of the plaintiff's condition and knowingly withheld the prescribed medications. There was even evidence to suggest the defendants were maliciously drugging the plaintiff with the sleep aid medication.

The facts of Dadd, which affirmed the district court's denial of the defendants' motion to dismiss, also involved the defendants withholding doctor-prescribed medication.  827 F.3d 749. The day before his arrest, the plaintiff underwent extensive dental surgery that involved cutting

into his jawbone and extracting a tooth, and the oral surgeon had prescribed the plaintiff prescription pain medication.  Id. The Eighth Circuit held that the defendants were not entitled to dismissal on the basis of qualified immunity where the defendants conceded the plaintiff was suffering from a serious medical condition, there were allegations that the plaintiff told each of the defendants he was in severe pain, and the jail had the prescription pain medication from his doctor. Again, the Eighth Circuit's ruling was based on the defendants' actual knowledge of the plaintiff's condition.

Foulks affirmed the denial of a motion for summary judgment finding the jail officials were not entitled to qualified immunity on a claim of deliberate indifference.  The Eighth Circuit held there was evidence that the defendants violated the plaintiff's constitutional rights where the plaintiff, who was severely beaten and was bleeding and bruised, was brought to the jail directly from the hospital with instructions from a physician for the care of his severe head injury.  991 F.2d at 457.  At the jail, the plaintiff complained of throwing up blood and had slurred speech, but no action was taken for two days when he was later transferred back to the hospital and underwent surgery for brain damage.  The situation of an arrestee being transported directly from the hospital to the jail with a severe head injury and physician instructions for care is not comparable to the facts of this case, where Mr. Starks was assessed at intake as having signs of drug withdrawal based on his own reports of drug use and stomach pain.

Finally, Phillips is distinguishable because there, the Eighth Circuit found on the defendants' motion for summary judgment that the plaintiff had come forward with evidence the defendants knew the plaintiff suffered a head injury and was prone to seizures, and knowingly withheld his doctor-prescribed anti-seizure medication.  The same cannot be said here.

The Court concludes Plaintiff fails to meet her evidentiary burden as to Defendants Tinoco and Tucker.  Plaintiff asserts Defendants Tinoco and Tucker knew Mr. Starks "was in an extremely fragile condition" and abandoned him knowing that he could die as a result.  (ECF No. 324 at 10). Defendants Tinoco and Tucker may have had access to medical records showing Mr. Starks had been assessed by the intake nurse with Acute Withdrawal Syndrome, but there is no evidence they knew he was in an extremely fragile condition and could die, or even that he had serious symptoms from withdrawal such as vomiting or diarrhea.  Plaintiff's argument appears to be based on her assertion that Acute Withdrawal Syndrome has known, serious, and even life-threatening risks. While this may be true, Plaintiff fails to support her argument with evidentiary support or establish the link showing that Defendants Tinoco and Turner knew this.

Based on the record before it, the Court finds Plaintiff has not put forth evidence that shows Defendants Turner and Tucker knew or should have known Mr. Starks was suffering from a serious medical condition and knowingly failed to provide him with medical care.  In sum, Plaintiff has not met her burden of producing "sufficient probative evidence" that would permit a finder of fact to find Defendants Tucker and Tinoco were deliberately indifferent to Mr. Starks's medical needs. Davidson & Assocs., 422 F.3d at 638.  They are entitled to judgment as a matter of law.

### C.    Supervisory Defendants

Plaintiff brings claims against Defendants Hendrix and Crancer for failure to train, supervise, and/or discipline.  Plaintiff moves for summary judgment as to Defendant Hendrix.  It is undisputed that neither Defendant Hendrix nor Defendant Crancer personally treated Mr. Starks. There is also no evidence they were personally involved in decisions regarding his medical care. Dahl v. Weber, 580 F.3d 730, 733–34 (8th Cir. 2009) (explaining that § 1983 liability requires personal involvement, and a supervisor's role in prison operations alone is insufficient to establish

liability).  Plaintiff's claims against both Defendant Hendrix and Defendant Crancer are based solely on their role as supervisors.

In order to be held liable under § 1983, a supervisor must either "directly participate[ ] in the constitutional violation or . . . fail[ ] to train or supervise the subordinate who caused the violation." Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 673 (8th Cir. 2007).  The Eighth Circuit has provided the following framework for determining supervisory liability under § 1983: A supervisor is liable if he or she "(1) had 'notice of a pattern of unconstitutional acts committed by subordinates'; (2) [was] deliberately indifferent to or tacitly authorized those acts; and (3) failed to take 'sufficient remedial action'; (4) proximately causing injury to [plaintiff]." Livers v. Schenck, 700 F.3d 340, 355 (8th Cir. 2012) (quoting Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996)).  See also Jane Doe A By & Through Jane Doe B v. Special Sch. Dist. of St. Louis Cnty., 901 F.2d 642, 645 (8th Cir. 1990). "In order to show deliberate indifference or tacit authorization, [plaintiffs] must allege and ultimately prove [defendants] 'had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.'" Id.  Under § 1983, supervisory liability requires a finding that a subordinate under the defendant's supervision violated the plaintiff's constitutional rights. See Eighth Cir. Model Jury Instructions, § 4.47.

Plaintiff argues in her summary judgment motion that Defendant Hendrix served as the supervisor for all nurses, including Defendants Tucker and Tinoco.  Plaintiff asserts that the undisputed evidence in the record shows Defendant Hendrix knew that many inmates who were on the Withdrawal Protocol were suffering and dying, and she knew many of them were being ignored by jail medical staff, yet failed to do anything about this "grotesque situation." (ECF No. 324 at 10-11). "[Defendant Hendrix] admitted that during her 8-year employment at the jail,

28

probably more than twenty of the inmates who were supposed to be treated for substance withdrawal died."  (Id.)

Plaintiff cannot prevail based on these arguments.  First, as discussed in detail above, Plaintiff fails to meet her burden to demonstrate that Defendant Hendrix's subordinates, specifically Defendants Tucker and Tinoco, violated Mr. Starks's constitutional rights.  On this basis alone, Plaintiff's claims of supervisory liability against Defendant Hendrix and Defendant Crancer fail.  A supervisor may be liable under section 1983 if their "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted).

Second, even if Plaintiff had established Defendants Tucker and Tinoco violated Mr. Starks's constitutional rights, there is no evidence that Defendant Hendrix or Defendant Crancer had notice of prior constitutional violations committed by these two nurses, or anyone else for that matter. Under Eighth Circuit precedent, the standard for § 1983 supervisory liability requires "proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." Krigbaum, 808 F.3d at 340.

In an attempt to establish the required notice, Plaintiff points to the fact that other assessments were not done in Mr. Starks's housing unit during the week he was confined.  This fact is not enough to provide a basis for § 1983 liability.  First, as a factual matter, it is not clear from the record that Defendants Tucker and Tinoco were the nurses responsible for these assessments.  Second, importantly, Plaintiff has not established that failure to perform an assessment of an inmate in withdrawal is a constitutional violation.  And third, there is no evidence

in the summary judgment record that either Defendant Hendrix or Defendant Crancer had notice or was aware of these specific failures prior to Mr. Starks's death.

Plaintiff also points to a quality control document dated March 2014 as evidence supervisors were on notice of a pattern of unconstitutional acts committed by the nurses at the Jail. She argues the internal document shows supervisors were aware at least sixteen months prior to Mr. Starks's confinement that inmates suffering from withdrawal were not getting their assessments or medications. The document does show Corrections Medicine had identified many instances of nurses failing to document assessments and medications given, and there were even problems with inmates on the Withdrawal Protocol not getting assessments and medicines. But the document does not establish that the defendants in this case, and more specifically Defendants Tucker and Tinoco, were the nurses who were identified as failing to do assessments or distribute medicine in 2014. As stated above, Plaintiff has not established that failure to do an assessment or give comfort medicine to an inmate in withdrawal is a constitutional violation. And, while the document shows that Corrections Medicine had identified problems in the implementation of the Withdrawal Protocol in 2014, it does not establish that either Defendant Hendrix or Defendant Crancer had notice there was a pattern of constitutional violations. Krigbaum, 808 F.3d at 340.

Finally, as evidence that the supervisory defendants were on notice of a pattern of unconstitutional acts, Plaintiff points to Defendant Hendrix's testimony that there "probably more than twenty detainees treated for withdrawal [who] died" between 2008 and 2015. (ECF No. 323 at 8). The Court agrees with the Defendants that Plaintiff has mischaracterized Defendant Hendrix's testimony and taken it out of context. On review of the transcript, the Court finds this testimony does not establish that there was a pattern and practice of unconstitutional violations of which the supervisory defendants were aware.

30

During her deposition, Defendant Hendrix was asked "how many times do you think somebody died who was on acute withdraw [sic] syndrome"?  (ECF No. 344, Ex. 5 at 274).  Defendant Hendrix responded that she could not even guess a number, but when pushed to respond, she testified there were probably "more than 20" during the time she was the nurse manager from 2008-2015. (Id. at 274-75).  She then added that "it was very common [ ] to send them to the hospital when there were – when they were getting everything they needed in the jail, and they sent them to the hospital and the hospital couldn't save them."  (Id.)

In isolation, twenty-plus deaths from acute withdrawal syndrome sounds like a large number, but when examined in context, tens of thousands of individuals were booked into the Jail from 2008-2015, and thousands of them were suffering from drug or alcohol withdrawal.[14]  Significantly, Plaintiff has offered no evidence as to the circumstances of these deaths, or even whether they were similar to the circumstances of Mr. Starks's death.  Most importantly, Nurse Hendrix did not testify that inmates on the Withdrawal Protocol who did not receive assessments and/or their medications died.  In fact, her testimony was the opposite.  She testified that there were inmates in withdrawal who died even when they had received their assessments, and medical staff had done all that could be done.[15]  Defendant Hendrix's testimony is not evidence from which a fact finder could reasonably conclude there was a pattern of unconstitutional acts at the Jail.

---

[14]The County also disputes that twenty inmates died at the Jail during this time period.  In response to Plaintiff's Motion for Summary Judgment, the County filed an affidavit from the Accreditation Manager for DJS, who attests that between 2008 and 2015, twelve inmates died at the Jail in total.  Mr. Starks is included in that tally.  (ECF No. 352, Ex. 2).

[15]The Court also finds Defendant Hendrix's testimony does not establish that Acute Withdrawal Syndrome is a serious medical condition.  Defendant Hendrix testified that these inmates died when they were in withdrawal, not that they died from withdrawal.  From this testimony, the causes of death are unknown.  These inmates could have died from causes unrelated to their withdrawal, such as from heart attack, suicide, infection, or other illnesses.  Furthermore, there is no evidence whatsoever as the circumstances of these deaths, such as the inmates'

In sum, Court finds Plaintiff fails to put forth evidence to impose supervisor liability in this case. Section § 1983 liability based on failure to supervise, train, and/or discipline requires a showing that an employee committed constitutional violations, which Plaintiff has not done. What is more, Plaintiff has not shown that the supervisory defendants were aware of a pattern or practice of constitutional violations at the Jail. Consequently, the Court finds Defendant Hendrix is entitled to summary judgment as a matter of law.

The Court further finds Defendant Crancer, who is similarly situated as lead nurse supervisor, is also entitled to summary judgment because her potential liability turns on the same issues as Defendant Hendrix. The Eighth Circuit has approved a sua sponte grant of summary judgment in favor of non-moving parties where the losing party had sufficient notice in the form of the summary judgment motion filed by another party, and the non-moving parties' right to summary judgment turned on the same issue presented by the motion of the moving party. Global Petromarine v. G.T. Sales & Mfg., Inc., 577 F.3d 839, 844 (8th Cir. 2009). See, e.g., Anzaldua v. Ne. Ambulance & Fire Prot. Dist., 793 F.3d 822, 837 (8th Cir. 2015) ("Once the district court determined no First Amendment violation had occurred, it was proper for the district court to enter summary judgment for all defendants facing identical First Amendment claims."); Madewell v. Downs, 68 F.3d 1030, 1050 (8th Cir. 1995) (there is no reason to delay entry of judgment for similarly situated parties).

**D.   Liability Against the County**

Plaintiff also seeks to hold the County itself liable for her son's death. To hold the County liable under § 1983, Plaintiff must show a constitutional violation that "resulted from (1) an official

---

conditions, age, how long they were using, the severity of their withdrawal symptoms, or whether they suffered from comorbidities.

municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." Corwin v. City of Indep., Mo., 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).  A policy is not the same thing as a custom. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  To establish liability based on an unofficial custom, a plaintiff must show "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." Snider v. City of Cape Girardeau, 752 F.3d 1149, 1160 (8th Cir. 2014).

Plaintiff has pointed to no policies that she contends are unconstitutional on their face as written.  Instead, Plaintiff argues the County should be held liable for having a pattern and practice of not doing assessments or giving out medications to inmates on the Withdrawal Protocol, problems she contends County officials were aware of and ignored.  She also argues the County should be held liable because it knew about these ongoing violations at the Jail and yet failed to train or properly supervise its staff.

The evidence she cites to support her argument that the County was on notice of these violations is the same evidence she uses to support her argument that the supervisory defendants, Defendants Hendrix and Crancer, were on notice.  As discussed above with respect to Defendants Hendrix and Crancer, even if County officials were aware of this information, the evidence does

not establish notice of a pattern or practice of unconstitutional violations.  Some of the evidence does show there was an ongoing problem of medical staff not complying with Jail policies.  While these lapses are not commendable, Plaintiff has not established that they rose to the level of constitutional violations.

Plaintiff has shown that there was a pattern of nurses not documenting assessments, and that assessments were not always being completed and comfort medications were not always given to inmates who were in acute drug withdrawal.  But Plaintiff fails to connect the dots and show that failing to comply with the Jail policies necessarily amounted to a constitutional violation.  The missing link is that Plaintiff has provided insufficient evidence about the seriousness and risks associated with acute drug withdrawal.  Plaintiff's own expert did not offer an opinion that Acute Withdrawal Syndrome is a serious medical condition. Without more information about the potential risks and seriousness of withdrawal symptoms, the fact that the Withdrawal Protocol was not always followed or properly documented cannot lead to the conclusion that the County was turning a blind eye to a pattern of constitutional violations.  Plaintiff fails to show that a County policy or custom "itself violated federal law, or directed or authorized the deprivation of federal rights." Bd. of Cnty. Com'rs of Bryan Cnty. Okl. v. Brown, 520 U.S. 397, 406 (1997).

In the summary judgment motions before the Court, Plaintiff focuses on the Defendants' failure to do assessments and distribute comfort medications to inmates in the housing units, but in her Fourth Amended Complaint, the statements of facts, and Dr. Heller's expert reports there are references to other conduct and circumstances at the Jail that contributed to Mr. Starks's death. For example, Dr. Heller opined that the 45-minute delay between when Mr. Starks was found on the floor of his cell and when he was treated at the infirmary contributed to his death.  Dr. Heller criticized corrections and medical staff for not calling 911 immediately when Mr. Starks was found

34

on the floor of his cell and for the long delay getting him to the infirmary.  He was also critical of Ms. Heitman for not sending Mr. Starks to the infirmary upon intake, and of Nurse Susman for not doing more when he had a low blood pressure reading the morning of August 5.  Plaintiff has abandoned all claims based on this conduct, however.  She failed to join in this case or dismissed the defendants who were involved in these events, and in responding to the County's Motion for Summary Judgment, did not argue that conduct during these events amounted to constitutional violations, that such conduct was taken pursuant to an official municipal policy, or that it was part of a custom, or pattern and practice.  Leftwich ex rel. Leftwich v. Cnty. of Dakota, 9 F.4th 966, 974 (8th Cir. 2021); Corwin, 829 F.3d at 699.

In addition, throughout this litigation and in her motion for summary judgment, Plaintiff makes much of the fact that the County did not complete a Morbidity and Mortality Review ("MMR") examining the circumstances of Mr. Starks's death.  Plaintiff argues this is evidence of systemic dysfunction in the health care the Jail provided to Mr. Starks and other inmates.  It appears undisputed that a policy in effect in August 2015 required Corrections Medicine to conduct an MMR when an inmate died, and one was not done for Mr. Starks.  While failure to comply with a policy in place is not to be commended, and it appears the lack of an MMR report hampered Plaintiff's discovery in this case, the County's failure to follow its internal policy calling for preparation of a review after Mr. Starks's death does not constitute a constitutional violation.  There is no remedy here for the County's failure to follow its own policy and do the MMR.  Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997); Cole, 993 F.2d at 1334.

In sum, Plaintiff fails to set forth evidence from which a factfinder could reasonably conclude the County is liable under § 1983 for Mr. Starks's death.  Plaintiff does not argue the County's policies were unconstitutional and led to Mr. Starks's death, and she points to no

evidence from which a factfinder could reasonably conclude there was a pattern or practice of constitutional violations at the Jail, and that County officials were aware of the pattern or practice. Consequently, Plaintiff fails to establish municipal liability against the County under § 1983.

Furthermore, because the Court grants summary judgment to the individual defendants on Plaintiff's underlying substantive claims, "municipal liability cannot succeed as a matter of law." Corwin, 829 F.3d at 700.  See also Whitney v. City of St. Louis, Mo., 887 F.3d 857, 861 (8th Cir. 2018) (finding there can be no § 1983 or Monell liability absent a constitutional violation by a government employee); McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005) ("This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim.").  The County is entitled to summary judgment as a matter of law.

### *V. Conclusion*

Mr. Starks died after being in the County's care, and there is evidence that failures by County employees contributed to his death, but this does not establish that the County and the individual Defendants violated Mr. Starks's constitutional rights.  To rise to the level of a constitutional violation, Plaintiff must show more than negligence or even gross negligence.  There must be conduct akin to criminal recklessness or intentional maltreatment. Popoalii, 512 F.3d at 499; Fourte, 746 F.3d at 387.  Based on the record before it, the Court finds Plaintiff has not shown that any of the Defendants in this case were deliberately indifferent to Mr. Starks's serious medical needs.  Plaintiff has not shown that the nurses, Defendants Tinoco or Tucker, or the correctional officer, Defendant Ivy, knew that Mr. Starks was facing a substantial risk of serious harm and did not respond to that risk.  Perry v. Adams, 993 F.3d 584, 587 (8th Cir. 2021).

Because Plaintiff fails to establish that the individual defendants – or any other employee – violated Mr. Starks's constitutional rights, her claims against supervisory Defendants Hendrix and Crancer also fail.  Finally, Plaintiff fails to establish § 1983 liability as to the County.  She points to no policy that is unconstitutional, and there is no evidence of a custom or pattern and practice of employees committing constitutional violations.  There is evidence that the Defendants in this case, and other employees, violated a number of Jail policies.  However, without more, policy violations do not amount to constitutional liability.  The Court does not condone the Defendants' conduct, and indeed some of the facts of this case are very troubling, but based on controlling law, the Court finds the remaining Defendants in this case are entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants St. Louis County and Cedric Ivy's Motion for Summary Judgment is **GRANTED.** [ECF No. 330]

**IT IS FURTHER ORDERED** that Plaintiff Margaret Starks's Motion for Summary Judgment against Defendant St. Louis County and Motion for Summary Judgment against Rita Hendrix, Reginald Tinoco, and Debra Tucker are **DENIED.**  [ECF Nos. 321 and 322]

 **IT IS FURTHER ORDERED** that consistent with the terms of this Memorandum and Order, the Court enters summary judgment against Plaintiff Margaret Starks and in favor of Defendants St. Louis County, Cedric Ivy, Faye Crancer, Rita Hendrix, Reginald Tinoco, and Debra Tucker.

**IT IS FURTHER ORDERED** that Defendants Faye Crancer, Rita Hendrix, Reginald Tinoco, and Debra Tucker's Motion for Leave to File a Motion for Summary Judgment Out of Time, Defendants Rita Hendrix, Reginald Tinoco, and Debra Tucker's Motion for Leave to File a

37

Sur-Reply in Response to Plaintiff's Motion for Summary Judgment, and  Plaintiff's Motion for Sanctions and/or to Strike Defendants St. Louis County and Ivy's Untimely Summary Judgment and <u>Daubert</u> Motion are **DENIED**.  [ECF Nos. 359, 366 and 382]

      **IT IS FURTHER ORDERED** that Defendants Faye Crancer, Rita Hendrix, Reginald Tinoco, and Debra Tucker's Motion to Continue Trial Setting, Defendants Faye Crancer and Rita Hendrix's Joint Motion to Dismiss, Defendants Reginald Tinoco and Debra Tucker's Joint Motion to Dismiss, Defendants St. Louis County and Cedric Ivy's Motion to Exclude the Testimony of Ross Heller, M.D., and three Motions in Limine are **DENIED as moot.**  [ECF Nos. 285, 287, 333, 367, 374, 375, and 378]

      An appropriate judgment shall accompany this Memorandum and Order.


_Ronnie L. White_____
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**


Dated this   5th   day of March, 2024.